No. 88-54

IN THE SUPREME COURT OF THE STATE OF MONTANA

1988

_____

IN THE MATTER OF DECLARING
M.W., a Youth in Need of Care.

_____

APPEAL FROM:   District Court of the Fourth Judicial District,
               In and for the County of Missoula,
               The Honorable Jack L. Green, Judge presiding.

COUNSEL OF RECORD:

        For Appellant:

            Diana P. Leibinger, Missoula, Montana

        For Respondent:

            Hon. Mike Greely, Attorney General, Helena, Montana
            Peter Funk, Asst. Atty. General, Helena
            Martha McClain, Missoula, Montana
            Robert L. Deschamps, III, County Attorney; Diane
            Conner, Courthouse, Missoula, Montana

_____

Submitted on Briefs:   Sept. 1, 1988

Decided: November 29, 1988

Filed:

FILED '88 NOV 29 AM 9 30 CLERK MONTANA SUPREME COURT

_____
Clerk

Mr. Justice John C. Sheehy delivered the Opinion of the Court.

R.W's parental rights as father of M.W., a child, were terminated on October 23, 1987, in the District Court, Fourth Judicial District, Missoula County. The District Court awarded the Montana Department of Social Rehabilitative Services custody of the child with authority to assent to adoption. R.W. appeals. This Court affirms the decision of the District Court.

The issues are these:

1. Did the District Court abuse its discretion by terminating the father's parental rights?

2. Is § 41-3-609(b), MCA (1985), unconstitutional as applied to non-custodial parents?

M.W. was born October 21, 1976. C.M. (mother) and R.W. (father) were living in California at the time of the child's birth. Mother left California in January, 1978, and came to Montana to visit her family. On April 2, 1979, mother filed a petition for dissolution of her marriage to R.W. in Missoula County. A default decree was entered on December 10, 1979. Custody of the child was awarded to mother and father was granted reasonable visitation and ordered to pay child support in the amount of $100 per month through the office of the Clerk of Court of Missoula County.

From 1978 to 1983, father had no contact with M.W. He attempted to see the child in 1980 but mother would not cooperate. In 1983, father moved to Missoula and again tried to establish contact with the child. After problems with visitation, father retained an attorney in Missoula to have his visitation rights specified by the court. During this time, father paid child support beginning May, 1983, at the

- 2 -

advice of his attorney. Part of the problem was mother's boyfriend, who demanded that all visitation arrangements be made through him. Father, father's wife and M.W.'s grandmother all found mother's boyfriend to be intimidating and physically threatening. Father complied for the most part with mother's boyfriend's demands, although father had to obtain law enforcement assistance on two occasions. Father discontinued child support payments in December, 1983.

In February, 1985, father moved to Glendive, Montana, with his girlfriend and her three daughters. He eventually married his girlfriend. When he left Missoula, he made no attempt to notify mother of his whereabouts. During this time, father made several trips to Missoula but was unable to locate mother. In one instance, he saw M.W. on the street but he did not approach the child.

In November, 1985, father and his wife and her children moved to Anacortes, Washington. Father made no effort to contact or locate mother and M.W. In December, 1986, M.W.'s maternal grandmother contacted father to inform him that his and mother's parental rights had been terminated. Father immediately contacted the Missoula County Attorney seeking custody of M.W.

The SRS placed M.W. in foster care in February, 1985, at mother's request. SRS had received referrals regarding M.W. from 1979 to 1985. Mother was supposed to take medication for epilepsy but failed to take the medication regularly. SRS learned she was not taking her medication, and that she and M.W. were living in a house with no hot water, electricity or heat. There was no food in the house and mother was being evicted. Other earlier referrals to SRS about M.W. concerned lack of food and inappropriate clothing.

Throughout the process, mother claimed to have no knowledge of father's whereabouts and was vague about his

identity. On September 18, 1986, after mother's failure to comply with a treatment plan, the District Court terminated mother's and "unknown father's" parental rights.

M.W. is mildly mentally retarded and has been placed in special education classes at school. M.W. has been treated by Dr. Cook, a child psychologist, since she was 2 years old. Dr. Cook opines that M.W. has been adversely affected by the combined effects of the absence of one parent and the neglect by the other parent. M.W. has demonstrated anxiety and fear because of the lack of a stable home environment and she becomes very fearful at the mention of any change in her current living arrangements.

On January 8, 1987, father filed a petition for custody claiming paternity. January 9, father filed motions pursuant to Rule 60(b)(1) - (4) of the Montana Rules of Civil Procedure seeking relief from that part of the September 18, 1986, judgment terminating his parental rights. On March 24, 1987, the District Court set aside its order of September 18, 1986, as applied to father and awarded him custody. On March 27, 1987, SRS filed a petition for temporary investigative authority and order for protective services which was issued that same day. On April 7, 1987, the State filed a petition to terminate parental rights alleging the father had abandoned M.W. On October 23, 1987, the District Court terminated father's parental rights on grounds of abandonment, § 41-3-609(1)(b), MCA.

I.

Did the District Court abuse its discretion by terminating father's parental rights?

Statutory law governing the termination of parental rights is found in Title 41, Chapter 3, MCA. Parental rights of the father were terminated pursuant to § 41-3-609(1)(a), MCA, which states parental rights may be terminated upon a

rights.  Section 40-6-102, MCA, defines the parent and child relationship as follows:

> "Parent and child relationship" means the <u>legal relationship</u> existing between a child and his natural or adoptive parents incident to which the law confers or imposes rights, privileges, duties and obligations.  It includes the mother and child relationship and the father and child relationship. (Emphasis added.)

The legal relationship between father and M.W. did not change despite the fact mother was awarded custody.  Father continued to have the obligation of support, § 40-6-211, MCA; he continued to have the right to obtain records regarding the child, § 40-4-225, MCA; he continued to have the right to visit the child, § 40-4-217, MCA, and the right to reciprocal support, § 40-6-214, MCA.  Section 41-3-102(3)(d), MCA, considers the action of "the <u>parent responsible</u> for the child's welfare," not the action of the custodial or noncustodial parent.  Father had continuing responsibilities for the child that did not disappear when he and mother divorced.  However, father failed to continue in his obligations to this child and thus, abandoned the child within the meaning of § 41-3-609(b).

In the Matter of R.B. Jr., Youth in Need of Care (Mont. 1985), 703 P.2d 846, 42 St.Rep. 1055, this Court emphasized the procedural aspect:

> We emphasize that the termination in Montana of a natural parent's right to care and custody of a child is a fundamental liberty interest, which must be protected by fundamentally fair procedures . . .

<u>R.B.</u>, 703 P.2d at 848.

Father argues he was not afforded adequate due process.  We disagree.  Although father was not properly notified of the first proceeding in which mother's and "unknown father's" rights were terminated, the District Court rectified the

finding that the child has been abandoned as set forth in § 41-3-102(3)(d), MCA:

> "(3) Harm to the child's health or welfare" means the harm that occurs whenever the parent or other person responsible for the child's welfare: . . . (d) abandons the child by leaving him under circumstances that make reasonable the belief that the parent or other person does not intend to resume care of the child in the future or by willfully surrendering physical custody for a period of 6 months and during that period does not manifest to the child and the person having physical custody of the child a firm intention to resume physical custody or to make permanent legal arrangements for the care of the child; . . .

This Court has stated that due to the presumption of correctness of the determinations of the District Court regarding custody of children, findings will not be disturbed unless a finding of fact is not supported by substantial credible evidence. In Re the Matter of C.G. (Mont., Decided January, 1988), 45 St.Rep. 63. This Court has also stated that the State is required to meet its burden of proof by clear and convincing evidence in the termination of parental rights. In the Matter of JLB, Youth in Need of Care (1979), 182 Mont. 100, 594 P.2d 1127; In the Matter of MSM, Youth in Need of Care (Mont. 1982), 654 P.2d 994, 39 St.Rep. 2191. This standard was adopted by this Court after the U.S. Supreme Court mandated this higher standard in Sandusky v. Kramer (1982), 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599.

In the present case, father had no contact with M.W. for three years and at no time indicated his intention to resume custody of the child until he learned his parental rights had been terminated. By this time, M.W. had been in foster care almost two years. Father's failure to make contact with M.W. for three years supports a finding by the District Court that father abandoned M.W. within the meaning of the statute.

This Court found a father had abandoned his children in the case of In the Matter of MJD, CKD, ARD, Youths in Need of Care (Mont. 1987), 731 P.2d 937, 44 St.Rep. 167, when the noncustodial father had minimal contact with his children for two years. This Court noted in that case that the period for establishing abandonment is six months. MJD, 731 P.2d at 940. Father's lack of contact for three years clearly establishes abandonment under the controlling statute.

Other evidence that establishes father's abandonment of the child includes the fact that father was well aware of mother's mental retardation and the fact she suffered from epileptic seizures because she failed to regularly take her medication. He testified that when they were married, mother refused to take her medication regularly and did not care for M.W. properly but yet he made no attempt to prevent mother from gaining custody in the dissolution of their marriage. It was this failure by mother to take her medicine that eventually caused SRS to proceed with termination of mother's parental rights. It was reasonable for the District Court to assume that an interested father would not leave a child in the hands of a clearly incompetent mother.

II.

Is § 41-3-609(b), MCA (1985), unconstitutional as applied to noncustodial parents?

Father contends that because he was the noncustodial parent, he could not have abandoned his daughter and the procedure terminating his parental rights because of abandonment is fundamentally unfair. The guardian ad litem contends that this argument fails to consider the ongoing nature of the rights and obligations of the noncustodial parent. This Court agrees with the guardian ad litem. The noncustodial parent continues to have obligations as well as

situation by reinstating father's rights. Father was given proper notice of the second proceeding in which his rights were terminated. The District Court appointed counsel on behalf of the father in order to protect his rights at the beginning of the procedure to have his parental rights reinstated. Father personally appeared at all subsequent hearings with his attorney. Procedural due process means notice and opportunity to appear. This Court concludes that father was afforded adequate due process.

This Court finds there is substantial evidence in the record to support the District Court's findings of fact and order terminating father's parental rights.

Affirmed.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____

_____
Justices

- 8 -