No. 00-426

IN THE SUPREME COURT OF THE STATE OF MONTANA

2001 MT 11

IN THE MATTER OF

S.M., and P.L.M.,

Youths in Need of Care.

APPEAL FROM: District Court of the Thirteenth Judicial District,

In and for the County of Yellowstone,

The Honorable Maurice R. Colberg, Jr., Judge presiding.

COUNSEL OF RECORD:

For Appellants:

Kevin T. Sweeney, Sweeney & Healow, Billings, Montana (Appellant Mother); Nancy L. Wetherelt, Wetherelt Law Offices, Billings, Montana (Appellant Father)

Guardian Ad Litem:

Damon L. Gannett, Gannett Law Firm, Billings, Montana

For Respondent:

Joseph P. Mazurek, Montana Attorney General, Nancy G. Schwartz, Assistant Montana Attorney General, Helena, Montana; Dennis Paxinos, Yellowstone County Attorney, Melanie Logan, Deputy Yellowstone County Attorney, Billings, Montana

Submitted on Briefs: November 30, 2000
Decided: February 14, 2001

Filed:

_____

Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1 The biological mother and father of the minor children, S.M. and P.L.M., appeal the judgment of the District Court for the Thirteenth Judicial District, Yellowstone County, terminating their parental rights. We affirm.

¶2 We address the following issues on appeal:

¶3 1. Whether the District Court properly admitted the hearsay statement of S.M.

¶4. Whether the District Court's findings that the biological parents had failed to successfully complete their treatment plans and that the conduct or condition rendering them unfit was unlikely to change within a reasonable period of time were clearly erroneous.

## Factual and Procedural Background

¶5 On May 18, 1999, the Department of Public Health and Human Services (DPHHS) filed a Petition for Permanent Legal Custody, Termination of Parental Rights and Right to Consent to Adoption of a girl, S.M., and her brother, P.L.M., the biological children of Michael and Michelle. S.M. was born on December 12, 1992, and P.L.M. was born on October 24, 1997.

¶6 DPHHS first became involved with this family in February 1997, when they received a report concerning illegal drugs in the home. Upon investigation at the home, a DPHHS social worker observed a scale with marijuana on it and a cooler containing approximately half a pound of marijuana. Michael and Michelle claimed to have no knowledge of these items even though the items were discovered in their bedroom. The social worker also noted that the home was filthy and there were pornographic materials on the floor in full view of four-year-old S.M.

¶7 DPHHS was granted temporary investigative authority and S.M. was placed out of the home. (P.L.M. had not yet been born.) Both Michael and Michelle were asked to complete treatment plans. Michael failed to complete his treatment plan although he did complete a chemical dependency evaluation wherein he was diagnosed as chemically dependent. It was recommended that he complete an intensive outpatient chemical dependency program, but he did not follow through with this recommendation.

¶8 Michael and Michelle separated in March 1997, and Michelle moved in with her mother. In June 1997, DPHHS dismissed the youth-in-need-of-care proceedings and returned S.M. to Michelle. Michael and Michelle divorced in November 1997.

¶9 DPHHS became involved with this family again in May 1998, when DPHHS received a report that Michelle's boyfriend, Gerald, who was residing with Michelle and the children, was abusive. DPHHS was concerned because Gerald had a history of being abusive and a history with the Laurel Police Department. DPHHS made a home visit and discussed these concerns with Michelle and Gerald. Michelle denied that any abuse had occurred.

¶10 The investigation in the current action was initiated in July 1998, when DPHHS received a police report that Gerald and Michelle had been charged with negligent child endangerment. The charges stemmed from an incident where S.M., age five, had soiled her pants while in the parties' vehicle and Gerald punished her by placing her on top of the vehicle and forcing Michelle, who was in the driver's seat, to drive for several blocks. Gerald maintained that S.M. could not be inside the vehicle because she had soiled her pants. Both Michelle and Gerald entered guilty pleas to the charges of negligent child endangerment.

¶11 Around this time, DPHHS also became aware of a June 21, 1998 incident involving Gerald in which Gerald was driving at speeds of 70 to 75 miles per hour in a 35 mile per hour zone while attempting to elude police and while P.L.M. was in the back seat of the vehicle. The arresting officer later testified that Gerald showed "no regard for the baby's safety or welfare." Gerald was subsequently charged with a number of traffic violations. After these incidents, P.L.M., then eight months old, and S.M. were removed from the home and placed in foster care.

¶12 After the children were placed in foster care, DPHHS learned that S.M. had been both physically and sexually abused while in her mother's care. S.M. had numerous bruises as

well as bite marks on her bottom. During the investigation, Michelle gave conflicting stories regarding the abuse. At first, Michelle claimed that Gerald had never been alone with the children and that it was Michael who had sexually abused S.M. Later, after Gerald left her, Michelle claimed that she had left the children alone with Gerald on several occasions and that it was Gerald who had sexually abused S.M.

¶13 Michelle also acknowledged that Gerald was physically abusive to S.M. and that this abuse began within a month of Gerald's moving in with Michelle. Michelle stated that Gerald would pinch S.M. and hit her with his fist. In her testimony at the November 30, 1999 hearing, Michelle admitted that Gerald had left bruises on S.M.'s ankle, knee and stomach prior to DPHHS removing the children. Nevertheless, Michelle continued to live with Gerald until September 1998, when he left her for another woman. Gerald was charged with these offenses and he eventually pleaded guilty to felony assault.

¶14 Shortly after Gerald moved out, Michelle moved back in with Michael. However, by early January 2000, Michael and Michelle had again separated.

¶15 DPHHS filed a Petition for Temporary Custody on October 26, 1998. After a hearing, the District Court adjudicated the children as youths in need of care and placed the children with DPHHS for a period of six months. On May 18, 1999, DPHHS filed a Petition for Permanent Legal Custody, Termination of Parental Rights, and Right to Consent to Adoption. The petition was tried before the District Court commencing August 27, 1999. Trial continued on November 30, 1999, January 7, 2000, and January 21, 2000. The District Court entered its Findings of Fact and Conclusions of Law on March 21, 2000, wherein the court terminated Michael and Michelle's legal rights to S.M. and P.L.M. From this judgment both parents appeal.

¶16 On April 25, 2000, the children's guardian *ad litem* filed a motion in the District Court requesting a hearing to address the placement of the children. DPHHS planned to place the children with Michael's mother and stepfather in Mississippi. DPHHS also determined that it would be in the children's best interests for them to continue to have access to their father. The guardian *ad litem* had concerns about Michael's mother's ability to raise the children based on how she had raised Michael. The District Court heard testimony on this motion and on June 5, 2000, the court issued an order directing DPHHS not to place the children pending a final hearing. Pursuant to an order of the District Court, the transcript and exhibits from the hearing on the guardian *ad litem's* motion are included in the record now before us.

# Issue 1.

¶17 *Whether the District Court properly admitted the hearsay statement of S.M.*

¶18 We review a trial court's evidentiary rulings to determine if the court abused its discretion. *In the Matter of A.N. and C.N.*, 2000 MT 35, ¶ 22, 298 Mont. 237, ¶ 22, 995 P.2d 427, ¶ 22 (citing *Inquiry into M.M.* (1995), 274 Mont. 166, 169, 906 P.2d 675, 677). We will not reverse a court's evidentiary rulings absent a manifest abuse of that discretion. *A.N.*, ¶ 22.

¶19 When testifying about Michelle's failure to protect S.M. from abuse, social worker Jerri Tate mentioned an incident that occurred in August 1998. S.M. was in the custody of DPHHS and Michelle had scheduled visitation. At one visit, Michelle brought Gerald and a person she introduced as her brother. Tate knew Michelle did not have a brother. When Tate confronted Michelle with this information, Michelle admitted that the person was actually Gerald's brother. Tate asked Gerald and his brother to leave before S.M. and P.L. M. arrived for their visit. The two men left the building, but remained in a car parked outside. When S.M. and her foster mother walked by, Gerald said hello to S.M. Tate testified that this frightened S.M. and when asked how she knew S.M. was frightened, Tate replied, "[b]ecause she stated she was."

¶20 Michelle's counsel objected arguing that the statement was hearsay and should be stricken from the record. The District Court overruled the objection. Tate was then asked:

> Q: Did you see any behavior that indicated [S.M.] was frightened?
>
> A: Yes, she was hanging onto the foster mother's arm very, very close to her at the side of her body with a very frightened look in her eyes.

Defense counsel did not object to Tate's observations of S.M.'s appearance and behavior.

¶21 Michelle now argues on appeal that S.M.'s statement is inadmissible hearsay because she was not testifying before the District Court. Michelle relies on *State v. Campbell* (1978), 176 Mont. 525, 579 P.2d 1231, wherein this Court determined that the trial court committed reversible error when it allowed Head Start teachers and a police officer to testify to statements made by a four year old to her teachers that the defendant had beaten her and her sister with a wooden plunger. We held in that case that these statements were

offered to prove the truth of the matter asserted and were therefore hearsay. *Campbell*, 176 Mont. at 528, 579 P.2d at 1233.

¶22 However, unlike the statements made by the child in *Campbell*, S.M.'s statement was made while she was perceiving a startling event and while she was under the stress of the excitement caused by that event. Moreover, the statement related to her then existing emotional state.

¶23 While hearsay includes both oral assertions and nonverbal conduct intended as an assertion, made by a person not currently testifying, and offered in evidence to prove the truth of the matter asserted (Rules 801(a) and (c), M.R.Evid.), and is thus generally inadmissible (Rule 802, M.R.Evid.), there are several exceptions to the hearsay rule. S. M.'s statement regarding her fear falls within the following exceptions:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> (1) Present sense impression. A statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter.
>
> (2) Excited utterance. A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.
>
> (3) Then-existing mental, emotional, or physical condition. A statement of the declarant's then-existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed.

Rule 803, M.R.Evid.

¶24 The statement in question was made by S.M. upon seeing Gerald, S.M.'s abuser. S. M.'s statement was her present sense impression explaining her condition (Rule 803(1)); it was related to a startling event--suddenly being confronted by Gerald (Rule 803(2)); and it was a statement of her then existing mental and emotional condition (Rule 803(3)). The statement was made before S.M. had time to reflect and it was not made in response to

questioning. Consequently, S.M.'s statement was admissible.

¶25 Nevertheless, S.M.'s statement was not the only source of the District Court's finding that S.M. was frightened of Gerald. Michelle herself testified that every time S.M. hears Gerald's name, "she'll start crying. . . ." In addition, Tate testified, without objection, that after seeing Gerald, S.M. was clinging to her foster mother with "a very frightened look in her eyes."

¶26 Even if the District Court had improperly admitted S.M.'s statement, this evidence was not of such a character to have affected the result of this case. S.M.'s fear of Gerald, although relevant, is not material to the issue of the termination of Michael and Michelle's parental rights.

¶27 Accordingly, we hold that the District Court did not abuse its discretion when it admitted S.M.'s statement.

## Issue 2.

¶28 *Whether the District Court's findings that the biological parents had failed to successfully complete their treatments plans and that the conduct or condition rendering them unfit was unlikely to change within a reasonable period of time were clearly erroneous.*

¶29 In reviewing a decision to terminate parental rights, we must determine whether a district court's findings of fact supporting termination are clearly erroneous and whether the district court's conclusions of law are correct. *In the Matter of C.D.S., S.E.S., and T.M.S.*, 2000 MT 313, ¶ 5, ___ Mont. ___, ¶ 5, 14 P.3d 1248, ¶ 5 (citing *In re the Custody and Parental Rights of P.M.*, 1998 MT 264, ¶ 12, 291 Mont. 297, ¶ 12, 967 P.2d 792, ¶ 12). As to the statutorily required findings of fact supporting termination, this Court has long recognized that a natural parent's right to care and custody of a child is a fundamental liberty interest which must be protected by fundamentally fair procedures. *C.D.S.*, ¶ 5.

¶30 Consequently, prior to terminating an individual's parental rights, a district court must

adequately address each applicable statutory requirement to determine if it has been established, and the burden is on the party seeking termination to demonstrate by clear and convincing evidence that every requirement set forth in the statute has

been satisfied. In the context of parental rights termination cases, we have defined clear and convincing evidence as simply a requirement that a preponderance of the evidence be definite, clear, and convincing, or that a particular issue must be clearly established by a preponderance of the evidence or by a clear preponderance of the proof.

*In the Matter of B.F., R.F., and M.S., Jr., 2000 MT 231, ¶7, ___ Mont. ___, ¶ 7, 8 P.3d 790, ¶ 7 (quoting P.M., ¶ 12). A finding that a statutory requirement has been satisfied is clearly erroneous if it is not supported by clear and convincing evidence. B.F., ¶ 7.*

¶31 The following criteria govern the termination of parental rights in this case:

> (1) The court may order a termination of the parent-child legal relationship upon a finding that any of the following circumstances exist:
>
> . . .
>
> (f) the child is an adjudicated youth in need of care and both of the following exist:
>
> (I) an appropriate treatment plan that has been approved by the court has not been complied with by the parents or has not been successful; and
>
> (ii) the conduct or condition of the parents rendering them unfit is unlikely to change within a reasonable time.

Section 41-3-609, MCA. When considering the criteria for termination, primary consideration must be given to the best interests of the child as demonstrated by the child's physical, mental, and emotional conditions and needs. *In the Matter of J.N. and A.N.*, 1999 MT 64, ¶ 13, 293 Mont. 524, ¶ 13, 977 P.2d 317, ¶ 13 (citing § 41-3-609(3), MCA).

¶32 Neither Michael nor Michelle challenge the District Court's findings that S.M. and P.L. M. are youths in need of care. Nor does Michael challenge the District Court's findings that he did not complete his treatment plans. Both Michael and Michelle challenge the court's findings that the conduct or condition rendering them unfit is unlikely to change within a reasonable time and Michelle challenges the court's findings that her treatment plan was not successful.

## A. Termination of Michael's Parental Rights

¶33 The District Court terminated Michael's parental rights because he did not complete any of his treatment plans, he has a history of violent behavior, and he continues to exhibit excessive use of intoxicating liquor or of a narcotic drug that affects his ability to care for his children. Michael admits he did not complete his treatment plans, but he questions the need for a treatment plan when he was not the abuser of his children; his parenting skills or lack thereof did not place the children "in harm's way;" and he could not afford to do the tasks asked of him on the treatment plan.

¶34 Michael focuses on the problems stemming from the 1998 incidents of abuse involving Gerald, however, Michael's problems involving his ability to parent his children go back to the 1997 incident when drugs were discovered in his home, pornography was discovered on the floor in full view of S.M., and the house was filthy. In that incident, both Michael's and Michelle's use of drugs in the home and lack of parenting skills placed S.M. "in harm's way." After Michelle completed her treatment plans stemming from that incident, S.M. was returned only to her care. S.M. was not returned to Michael's care following the 1997 incident because Michael refused to complete any of his treatment plans. Michael's noncompliance was not a factor in returning S.M. to Michelle because Michael was no longer residing with Michelle, and they subsequently divorced.

¶35 Michael has a long history of failing to complete the requirements of his treatment plans. Michael was evaluated by a chemical dependency counselor on June 14, 1999, who recommended that he undergo intensive outpatient treatment and attend regular AA meetings. Michael did not follow through with these recommendations.

¶36 Michael was scheduled to provide 20 urine samples for testing between July and September 1999. He refused to provide any samples even though he was warned in writing that a failure to provide a sample would be considered a positive test.

¶37 Although Michael's treatment plan required him to refrain from any criminal activity, Michael spent August and September of 1998 in jail for disorderly conduct. He was also arrested for a theft charge in May 1999.

¶38 At the January 7, 2000 termination hearing, Michael testified that he was currently homeless and unemployed. He acknowledged that he had not completed his treatment plans and he testified that he would never attend counseling.

¶39 In summary, the unrefuted evidence produced at the hearings in this matter revealed that Michael failed to complete the following requirements of his treatment plan: (1) maintaining a safe home; (2) maintaining a stable financial situation; (3) establishing and following a monthly budget; (4) completing individual/family therapy; (5) completing a psychological evaluation and following the recommendations; (6) completing anger management counseling; (7) following the recommendations of his chemical dependency evaluation; (8) attending three AA meetings per week; (9) submitting to random UA's; and (10) visiting regularly with the children.

¶40 In addition, although Michael testified that he had concerns about his children while Michelle was living with Gerald, Michael did not attempt to obtain custody. Furthermore, during the 1997 action and initially during this action, S.M. and P.L.M. were placed with Michael's father and step-mother. The children had to be removed from this home in April 1999, due to physical abuse by Michael's step-mother. It was not until after the children were removed from this home that Michael and Michelle disclosed that they did not feel that Michael's father and step-mother were appropriate caretakers due to abusive incidents towards Michael when he was a child. Certainly, a non-custodial parent cannot stand by and allow his or her children to be abused. *See In the Matter of M.W.* (1988), 234 Mont. 530, 534, 764 P.2d 1279, 1282.

¶41 Michael's refusal to take responsibility for his own actions; his refusal to appropriately address his inadequacies as a parent; and his failure to cooperate over the course of this case supports the District Court's conclusion that the conduct or condition rendering Michael unfit is unlikely to change within a reasonable time. As this Court has stated, "Regrettably, we do not have a crystal ball to look into to make this determination, so it must, to some extent, be based on a person's past conduct." *In the Matter of C. A. R.* (1984), 214 Mont. 174, 187, 693 P.2d 1214, 1221.

¶42 Accordingly, we hold that the District Court did not err in terminating Michael's parental rights.

## B. Termination of Michelle's Parental Rights

¶43 The District Court determined that although Michelle attempted compliance with her treatment plans, those attempts did not successfully rehabilitate her to obtaining minimum parenting skills. The court further determined that the conduct and condition rendering Michelle unfit had not sufficiently improved over the past 18 months and thus that conduct

and condition is unlikely to change within a reasonable time. Consequently, the court terminated Michelle's parental rights.

¶44 We have repeatedly held that partial compliance with a treatment plan is insufficient to preclude termination of parental rights. *In the Matter of K.A.B.*, 1999 MT 71, ¶ 19, 294 Mont. 29, ¶19, 977 P.2d 997, ¶19 (citations omitted). Not only must the parent comply with the treatment plan, but the treatment plan must also be successful. *B.F.*, ¶ 15 (quoting *In re E.W.*, 1998 MT 135, ¶ 26, 289 Mont. 190, ¶ 26, 959 P.2d 951, ¶ 26). It is well established that a treatment plan can be unsuccessful even when the tasks were completed. *In the Matter of S.M., R.D., Jr., D.D., S.D., C.D., and J.D.*, 1999 MT 36, ¶ 25, 293 Mont. 294, ¶ 25, 975 P.2d 334, ¶ 25 (citing *In the Matter of R.B.O.* (1996), 277 Mont. 272, 281, 921 P.2d 268, 273).

¶45 Michelle was offered three separate treatment plans. She failed to prepare monthly budgets as required by her treatment plans and she did not attend family therapy. But, more importantly, Michelle did not successfully complete her treatment plans because she continues to be incapable of understanding and anticipating the dangers that her personal decisions present to the children.

¶46 Therapist Anne Harris, who worked with Michelle, testified about an incident where Michelle was having an unsupervised visit with her children at a swimming pool. While Michelle was focusing her attention on S.M., she failed to notice that P.L.M. had wandered off. It was not until S.M. brought it to her attention that Michelle realized that P.L.M. had fallen and was lying face down on the bottom of the wading pool.

¶47 After this incident, DPHHS did not allow any more unsupervised visits outside their offices because Michelle had demonstrated that she was incapable of safely supervising more than one child at a time. As DPHHS points out, it is disingenuous to argue that a mother who is not even allowed unsupervised visits with her children possesses even minimally adequate parenting skills.

¶48 Michelle knew Gerald did not have a driver's license, yet she allowed him to drive with the children in the car. Michelle testified that she let Gerald move in with her and the children after knowing him a very short time "because he was cute." Michelle's inability to protect S.M. led to S.M. being physically and sexually abused by Gerald. Michelle continued to live with Gerald even after she was confronted with his physical and sexual abuse of S.M. Moreover, Michelle expressed disbelief that S.M. had been abused and it

was Gerald that eventually broke off their relationship, not Michelle.

¶49 When S.M. and P.L.M. were removed from Michelle's care in July 1998, DPHHS scheduled several visits for Michelle. Michelle brought Gerald, S.M.'s abuser, with her to one of the scheduled visits. In addition, Michelle seems unaware of the special needs of her daughter as a result of the abuse she experienced. When asked about S.M.'s special needs, Michelle indicated that S.M. may need to be tested for dyslexia, but could identify no other concerns.

¶50 Furthermore, as previously noted, during the 1997 action and initially during this action, S.M. and P.L.M. were placed with Michael's father and step-mother. It was not until after the children were removed from this home due to physical abuse by Michael's stepmother that Michael and Michelle disclosed that they did not feel that Michael's father and step-mother were appropriate caretakers due to abusive incidents towards Michael when he was a child.

¶51 Michelle argues that she poses no harm to her children and that the men previously in her life, Michael and Gerald, cannot now be used to deny her her parental rights. However, as we noted previously, we do not have a crystal ball to look into, so our determination of a person's ability to parent their child must, to some extent, be based on that person's past conduct. *C. A. R.,* 214 Mont. at 187, 693 P.2d at 1221. It is precisely because of the men Michelle previously let into her life and the children's lives that DPHHS is concerned that Michelle is incapable of keeping her children safe from future harm that could be inflicted upon them by third parties.

¶52 Social worker Jerri Tate testified that in her opinion Michelle remains a risk to her children. Therapist Anne Harris testified that Michelle still had problems in telling men no, that she would tell lies to cover for them, and that her judgment would likely be influenced by men. Thus, even if Michelle had completed all of the requirements of her treatment plans, the treatment plans have not been successful in rehabilitating her to obtaining minimum parenting skills and it is unlikely that these attributes of Michelle's will change within the immediately foreseeable future. We conclude that there is clear and convincing evidence to support the District Court's finding that Michelle's conduct or condition which renders her unfit as a parent is unlikely to change within a reasonable time.

¶53 Accordingly, we hold that the District Court did not err in terminating Michelle's

parental rights.

¶54 Affirmed.

/S/ JAMES C. NELSON

We Concur:

/S/ KARLA M. GRAY

/S/ JIM REGNIER

/S/ W. WILLIAM LEAPHART

/S/ TERRY N. TRIEWEILER