DA 13-0274

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2014 MT 28

IN THE MATTER OF:

K.L.,

A Youth in Need of Care.

APPEAL FROM: District Court of the Eighth Judicial District,
In and For the County of Cascade, Cause No. BDN 11-127
Honorable Julie Macek, Presiding Judge

COUNSEL OF RECORD:

For Appellants:

Wade Zolynski, Chief Appellate Defender; David G. Dennis, Assistant
Appellate Defender; Helena, Montana
(for Mother)

Julie Brown, Montana Legal Justice, PLLC; Missoula, Montana
(for Father)

For Appellee:

Timothy C. Fox, Montana Attorney General; Tammy A. Hinderman,
Assistant Attorney General; Helena, Montana

John Parker, Cascade County Attorney; Jennifer Quick, Deputy County
Attorney; Great Falls, Montana

Submitted on Briefs: January 2, 2014
Decided: February 4, 2014

Filed:

_____
Clerk

Justice Patricia Cotter delivered the Opinion of the Court.

¶1    T.L. (Father) and N.W. (Mother) are the biological parents of K.L., born in 2009. K.L. was first removed from her parents' custody and placed into foster care in July 2011. Her parents split shortly thereafter. In October 2011, K.L. was adjudicated as a youth in need of care. In August 2012, the Department of Public Health and Human Services (Department or DPHHS) filed a petition to terminate the parental rights of both parents. A termination hearing was held in February 2013, and the District Court issued its order of termination on March 28, 2013. Between the time K.L. was removed from her parent's care in July 2011 and the termination of rights of both parents, K.L. was twice reunified through trial home visits with her father and twice removed and re-placed into foster care. There was no reunification attempt with her mother between the July 2011 removal and the termination of Mother's parental rights. Both parents appeal the order of termination. We affirm.

## ISSUES

¶2    A restatement of Father's issues is:

¶3    Did the District Court abuse its discretion and violate Father's constitutional rights by improperly granting the Department's motion for an extension of temporary legal custody over K.L.?

¶4    Did the District Court abuse its discretion and violate Father's constitutional rights when it terminated Father's parental rights finding that the condition or conduct rendering Father unfit to parent was not likely to change in a reasonable time?

¶5     A restatement of the dispositive issue on appeal vis-à-vis Mother is whether the District Court abused its discretion in terminating Mother's parental rights.

## FACTUAL AND PROCEDURAL BACKGROUND

¶6     On July 19, 2011, Mother and Father were living together and raising their daughter, K.L., who was then approximately twenty-five months old. Mother returned home one evening to find Father intoxicated and drinking with an intoxicated male stranger in the home and in the presence of K.L. A verbal argument ensued that subsequently turned violent. One of the parents began hitting the other with a broomstick. The stick broke, yielding one-half of the stick to each parent who continued hitting the other parent with it. The police arrived, both parents were arrested and jailed, and the child was placed into protective foster care. Father later admitted that he was in a "blind, drunken rage" at the time. K.L. remained in foster care and at an October 6, 2011 show cause hearing she was adjudicated a youth in need of care.[1] At some point between July and October, the parents stopped living together and terminated their relationship.

¶7     In November 2011, the Department prepared initial treatment plans for both Mother and Father. Mother signed her initial plan on November 22, 2011. In an effort to facilitate reunification, the goals of the treatment plan, in part, were to: (1) preserve the parent-child relationship; (2) assist Mother in acquiring the necessary skills to provide for her child's safety, permanency, and well-being; and (3) provide DPHHS with the information necessary to determine the strengths, needs, and concerns of the family, and

---

[1] The show cause hearing was delinquent and not in compliance with § 41-3-432, MCA, but counsel for parents did not file an objection.

whether it would be safe to return the child to Mother. Mother was specifically tasked with: (1) maintaining a safe home environment; (2) completing an in-home parenting plan and demonstrating what she learned; (3) addressing her mental health needs by completing a psychological evaluation and following the psychologists' recommendations; (4) attending domestic violence and relationship counseling as well as anger management counseling; (5) maintaining regular visitation with K.L.; and (6) initiating weekly contact with her case worker.

¶8 Father signed his treatment plan on November 4, 2011, and was tasked with many of the same tasks as Mother, e.g., maintaining a safe home environment, completing a parenting class, and addressing his mental health needs. In addition, given the bearing of Father's alcohol use on his ability to parent, the Department required that Father address his alcohol abuse or addiction through DPHHS-provided evaluations, therapy, and support.

¶9 On December 8, 2011, the District Court conducted a dispositional hearing at which the parents' treatment plans were presented for approval. Counsel for both parents stipulated to the initial treatment plans but reserved the right to submit written objections after reviewing the plans with their clients. The court issued an order on December 16, 2011, that, among other things, approved both treatment plans as appropriate and reasonable. Neither parent's counsel subsequently objected. In its December 16, 2011 order, the District Court granted the Department temporary legal custody (TLC) and both parents were ordered to complete their court-approved treatment plans.

¶10    As Father appeared to be making more progress on his treatment plan than Mother, the Department attempted to reunify K.L. with Father on January 5, 2012, for a trial home visit. Father entered into an agreement with the case worker that he would not drink alcohol when K.L. was in his care. K.L. remained in Father's custody until March 3, 2012, when the police were called because Father was publicly intoxicated while at a restaurant with K.L. K.L. remained in foster care until early May when she was again reunified with Father in a trial home visit. On June 11, 2012, the Department petitioned the court to extend TLC for an additional six months to allow the parents more time to complete their respective court-ordered treatment plans. Mother stipulated to the extension but Father opposed the petition. At a June 21, 2012 review hearing, the District Court granted a sixty-day, rather than a six-month, extension of TLC.

¶11    On June 23, 2012, police were again called by a third party who witnessed a "highly intoxicated" Father pushing K.L. in her stroller down a busy street in Great Falls after midnight, and then removing her from the stroller and allowing her to run in the street while he appeared too intoxicated to supervise or protect her. He was charged with child endangerment and K.L. was again removed from Father's custody.

¶12    Throughout this time, no attempt was made to reunify K.L. with Mother because Mother failed to make adequate progress with her treatment plan.

¶13    On August 9, 2012, the Department filed its petition to terminate the parental rights of both Mother and Father. The District Court held a termination hearing on February 13, 2013, and issued its order terminating the rights of both parents on March 28, 2013. Both parents filed timely notices of appeal.

5

## STANDARD OF REVIEW

¶14 The Department has the burden of proving by clear and convincing evidence that the statutory criteria for termination have been satisfied. Clear and convincing evidence in the context of parental rights cases is "simply a requirement that a preponderance of the evidence be definite, clear, and convincing, or that a particular issue must be clearly established by a preponderance of the evidence or by a clear preponderance of the proof. This requirement does not call for unanswerable or conclusive evidence." *In re B.H.*, 2001 MT 288, ¶ 16, 307 Mont. 412, 37 P.3d 736.

¶15 Additionally, in determining whether to terminate parental rights, "the district court is bound to give primary consideration to the physical, mental, and emotional conditions and needs of the children"; thus, "the best interests of the children are of paramount concern in a parental rights termination proceeding and take precedence over the parental rights." *In re E.K.*, 2001 MT 279, ¶ 33, 307 Mont. 328, 37 P.3d 690.

¶16 We review the district court's rulings on the Department's evidence to determine if the court's findings are clearly erroneous and if the court's conclusions are correct. *In re D.B.*, 2007 MT 246, ¶ 18, 339 Mont. 240, 168 P.3d 691. If the court's findings are not clearly erroneous and its conclusions are not incorrect, we will not disturb a district court's order on termination unless we determine that the district court abused its discretion. A district court abuses its discretion when it "acts arbitrarily, without employment of conscientious judgment, or exceeds the bounds of reason resulting in substantial injustice." *In re R.M.T.*, 2011 MT 164, ¶ 26, 361 Mont. 159, 256 P.3d 935.

## DISCUSSION

¶17 We first address Father's issues on appeal.

¶18 *Did the District Court abuse its discretion and violate Father's constitutional rights by improperly granting the Department's motion for an extension of temporary legal custody over K.L.?*

¶19 Section 41-3-442, MCA, provides the circumstances under which a district court may grant, or extend, temporary legal custody to the Department, and permits extending TLC upon a showing that "additional time is necessary for the parent . . . to successfully complete a treatment plan." Section 41-3-442(4)(a)(i), MCA. Father did not challenge the original granting of TLC but challenges the District Court's June 2012 extension of TLC. He maintains that on June 11, 2012, when the Department filed its petition to extend TLC, he had "completed his treatment plan goals"; consequently, no additional time was necessary to complete his plan. He further asserts that testimony at the June 21, 2012 TLC extension hearing illustrated that he had done "an outstanding job of parenting and compliance"; therefore, the extension should not have been granted.

¶20 The record reveals, however, that Father had not completed his treatment plan, and while he may have done "an outstanding job" on some aspects of the plan, several aspects of his plan were wanting, including, but not limited to, maintaining a safe home environment for K.L. Additionally, and most critically in Father's case, the plan required that he maintain sobriety. It was undisputed that he failed to do so. He was publicly intoxicated on March 3, 2012, in a restaurant with K.L. His intoxication led a third party bystander to call the police out of concern for K.L.'s safety and led to the removal of K.L. from Father's care. The Department expressed ongoing concern at the TLC hearing

7

that Father had not yet demonstrated that he believed his alcohol consumption was a "major concern" in his life. The Department wanted additional time to determine whether the March 3 event was an isolated incident or a continuing risk. The District Court's order clearly states that it was extending TLC out of concerns "on the issue of [Father's] alcohol usage." The court also noted that extending DPHHS's temporary legal custody was in K.L.'s best interests. The court had substantial credible evidence before it to support an extension of TLC. Despite the commendable successes Father may have achieved, it was not an abuse of the District Court's discretion to extend TLC for 60 days to allow Father to continue working on the remaining conditions and goals of his treatment plan, particularly his use of alcohol.

¶21 *Did the District Court abuse its discretion and violate Father's constitutional rights when it terminated Father's parental rights finding that the condition or conduct rendering Father unfit to parent was not likely to change in a reasonable time?*

¶22 Section 41-3-604, MCA, establishes when a petition to terminate parental rights *must* be filed by the Department. The statute provides, in relevant part:

> (1) If a child has been in foster care under the physical custody of the state for 15 months of the most recent 22 months, the best interests of the child must be presumed to be served by termination of parental rights. If a child has been in foster care for 15 months of the most recent 22 months or if the court has found that reasonable efforts to preserve or reunify a child with the child's parent or guardian are not required pursuant to 41-3-423, a petition to terminate parental rights must be filed unless:
> (a) the child is being cared for by a relative;
> (b)  the department has not provided the services considered necessary for the safe return of the child to the child's home; or
> (c)  the department has documented a compelling reason, available for court review, for determining that filing a petition to terminate parental rights would not be in the best interests of the child.

8

Section 41-3-604(1), MCA.

¶23 Additionally, under § 41-3-609, MCA, the Department *may* seek termination of parental rights if:

> (1)  The court may order a termination of the parent-child legal relationship upon a finding established by clear and convincing evidence . . . that any of the following circumstances exist:
>
> .  .  .
>
> (f)  the child is an adjudicated youth in need of care and both of the following exist:
> (i)  an appropriate treatment plan that has been approved by the court has not been complied with by the parents or has not been successful; and
> (ii)  the conduct or condition of the parents rendering them unfit is unlikely to change within a reasonable time.

¶24 On August 9, 2012, approximately 13 months after K.L. was first removed from her parents' custody, the Department filed a Petition for Permanent Legal Custody and Termination of Parental Rights. As it pertained to Father, the Department asserted he had failed to maintain sobriety, noting the second public intoxication episode on June 23, 2012, in which he was pushing K.L. in her stroller down a busy street after midnight, resulting in a child endangerment charge. The Department claimed that Father had also failed to maintain adequate housing and a safe environment for K.L., and had continually placed K.L. in danger, necessitating removal of her from his care. DPHHS further noted that Father failed to address his mental health and chemical dependency needs as recommended after a DPHHS-provided psychological evaluation. The Department therefore sought termination concluding that the conduct and condition rendering Father unfit to parent was unlikely to change within a reasonable time. A termination hearing

was scheduled for December 2, 2012, but at Father's request, it was vacated and rescheduled for February 21, 2013.

¶25 While awaiting the termination hearing, the Department continued monitoring Father's progress with his treatment plan and his visitation interaction with K.L. DPHHS filed supplemental affidavits dated December 4, 2012, and February 14, 2013, updating the District Court. In both affidavits, the Department expressed continued concern that Father could not, or would not, stop drinking and that he failed to recognize how his drinking impacted his parenting and was preventing reunification with K.L.

¶26 In addition to the testimony posited by the Department in these affidavits, there was considerable similar testimony at the termination hearing. The clinical psychologist who conducted a psychological evaluation on Father testified that Father "didn't think that he needed to quit drinking but that . . . he did need to quit [drinking] . . . while he was caring for his daughter and . . . he needed to quit drinking in public." Several other witnesses testified that Father told them he was merely "jumping through the hoops" until he got his daughter back and that he did not intend to quit drinking as his drinking was not a problem. Further, witnesses presented testimony of the number of times Father failed to appear for court-ordered urinalyses (UA) or failed UA tests, and that Father would at times engage in binge drinking and drink until he blacked out. The psychologist determined that the likelihood that Father would abstain from alcohol over the long-term was "relatively poor" and that "it was unlikely that he would become capable of parenting his child within a reasonable period of time."

¶27 By the time the termination hearing was conducted in February 2013, K.L. had been in foster care for the majority of the 19 months since her initial removal. This factor brings this case squarely within the presumption set forth in § 41-3-604(1), MCA—"[i]f a child has been in foster care under the physical custody of the state for 15 months of the most recent 22 months, the best interests of the child must be presumed to be served by termination of parental rights." It is clear from the record here that Father was unable, or unwilling, to abstain from alcohol. His testimony to the contrary at the termination hearing is not supported by his previous behavior and is unconvincing.

¶28 While Father made significant progress on some terms, conditions, and tasks set forth in his treatment plan, it is well-established that partial compliance with a treatment plan is insufficient to preclude termination of parental rights. *In re S.M.*, 2001 MT 11, ¶ 44, 304 Mont. 102, 19 P.3d 213. *See also In re D.H.*, 2001 MT 200, ¶ 30, 306 Mont. 278, 33 P.3d 616. Father's failure to comply with the court-mandated condition that he abstain from using alcohol while K.L. was in his care repeatedly placed K.L. in a dangerous situation. Focusing on K.L.'s best interests, the District Court did not abuse its discretion in concluding Father had failed to comply with his treatment plan. Moreover, in determining whether the condition rendering Father unfit to parent was unlikely to change within a reasonable time, § 41-3-609(2)(c), MCA, expressly states that the court shall consider whether the "excessive use of intoxicating liquor . . . affects the parent's ability to care and provide for the child." There was significant evidence presented throughout this proceeding that Father's parenting was adversely affected by alcohol use, and Father's repeated intoxication despite his awareness that he was being monitored and

11

had lost his daughter as a result of alcohol use, supported the court's decision to terminate his parental rights. The District Court did not abuse its discretion in concluding that Father's condition was unlikely to change within a reasonable time.

¶29 We affirm the District Court's termination of Father's parental rights. We now turn to Mother's issue on appeal.

¶30 *Did the District Court abuse its discretion in terminating Mother's parental rights?*

¶31 Mother argues on appeal that the District Court abused its discretion when it terminated her parental rights. She claims the District Court's finding that her treatment plan was appropriate was incorrect because the Department failed to modify the plan to incorporate the recommendations of state psychologist Dr. Mary Jo Jeffreys.[2] She also asserts the District Court abused its discretion in terminating her rights given the Department's failure to arrange critical mental health treatments recommended by Dr. Jeffreys. She therefore maintains that the Department failed to "make reasonable efforts" to reunify Mother and K.L.

¶32 To reiterate the relevant standard employed by the District Court to terminate Mother's parental rights to K.L., the court had to find "by clear and convincing evidence" that: (1) K.L. was an adjudicated youth in need of care; (2) Mother had not complied with a court-approved "appropriate treatment plan" or such plan was unsuccessful; and (3) the

---

[2] Mother also argued that the District Court failed to apply the "clear and convincing" standard to its determination that Mother's treatment plan was appropriate. As the court's termination order expressly applies such a standard and Mother concedes this in her reply brief, we decline to address this claim further.

condition rendering Mother unfit to parent was unlikely to change within a reasonable time. Section 41-3-609(1)(f)(i) and (ii), MCA. The first factor is not in dispute.

¶33 Addressing the second factor, Mother claims the District Court erred in concluding that her treatment plan was "appropriate" given that "the Department did not modify the plan to incorporate the recommendations of the state's psychologist." Mother was evaluated by Department-recommended clinical psychologist Dr. Mary Jo Jeffreys on February 2, 2012. The record does not contain Dr. Jeffreys' report but her testimony at the termination hearing revealed that during her evaluation, she identified numerous concerns about Mother's ability to parent K.L. According to the doctor, Mother exhibited "a high proclivity to not be able to understand how another person is feeling," and "a high proclivity to use force to get people to understand where she's coming from." Dr. Jeffreys concluded that Mother had an inability to identify with others and was rigid with a strong need to be in control. She also testified that Mother suffered with borderline intellectual functioning and had a severe thought disorder, and that she displayed rapid mood swings and lacked empathy. Consequently, the doctor recommended mental health treatment but expressed reservations, given the severity of Mother's mental and cognitive issues, about Mother's ability to "engage" in such treatment. Dr. Jeffreys also stated that even if Mother underwent mental health treatments, Mother is "at high risk of ever being able to parent."

¶34 There is no indication in the record as to when the Department received a copy of Dr. Jeffreys' report. However, the child protection specialist assigned by the Department to K.L.'s case completed an affidavit dated June 5, 2012, to support extending TLC. In

13

this affidavit, the Department specialist summarized Mother's treatment plan for the District Court. The affidavit reiterated the goals and tasks set forth in the initial November 2011 treatment plan and Mother's progress with each of the tasks. It also contained a new section discussing Mother's February 2, 2012 psychological evaluation with Dr. Jeffreys. This section of the affidavit indicated that Mother's treatment plan required Mother to "seek appropriate mental health treatment, including a psychiatric evaluation to address further mental health concerns." It also stated, among other recommendations, that Mother must engage in vocational rehabilitation, and participate in supportive psychotherapy and anger management. While the District Court record does not contain a modified treatment plan signed by Mother and the Department, this affidavit indicates that the Department incorporated Dr. Jeffreys' recommendations into Mother's treatment plan. Consequently, Mother's claim that the Department did not modify her plan to incorporate Dr. Jeffrey's recommendations is incorrect. Moreover, testimony at the hearing illustrated that various service providers became concerned about Mother's mental and emotional health and cognitive issues early in the proceeding and attempted to help Mother address them. *D.B.*, ¶¶ 34-35.

¶35 We have previously declined to create a "single, generalized definition of an 'appropriate' treatment plan." *D.B.*, ¶ 32. We have suggested the consideration of several factors, such as whether the parent was represented by counsel, whether the parent stipulated to the plan, and whether the plan "takes into consideration the particular problems facing both the parent and the child." *D.B.* ¶ 32. In the case before us, each of these factors was satisfied, as Mother was represented by counsel throughout the

14

proceedings and she stipulated to the plan and raised no objections to its contents. We therefore conclude the District Court did not err in finding that Mother's treatment plan was appropriate.

¶36 Mother argues that under § 41-3-423(1), MCA, the Department was required to "make reasonable efforts" to reunify her with K.L. Citing primarily extra-jurisdictional authority, she asserts that "reasonable efforts" required the Department to provide her with the mental health treatment recommended by Dr. Jeffreys, and that failure to do so precluded the Department from seeking termination of her rights. Acknowledging that the Department attempted to make appointments for Mother with various mental health providers, and that at the time of the termination hearing Mother was on "waiting lists" with one or more mental health professionals, she asserts that the Department's efforts were insufficient, and therefore did not constitute "reasonable efforts." Mother's argument suggests that had she received psychiatric counseling or medications between the date Dr. Jeffreys' conducted her psychological evaluation in February 2012 and termination of her rights in February 2013, reunification with K.L. may have been possible because she would have completed her treatment plan and the condition rendering her unfit would have changed for the better.

¶37 The Department counters that while "reasonable efforts" toward reunification is a Department obligation, it does not displace the statutory termination test set forth in § 41-3-609(1)(f)(i) and (ii), MCA, i.e., a youth in need of care adjudication, an unsuccessful appropriate treatment plan, and the unlikeliness that the condition rendering

15

a parent unfit will change within a reasonable time. The Department maintains that the record supports the District Court's finding that these criteria were met.

¶38 The Department worked closely with Mother from the time it removed K.L. in July 2011 until Mother's termination in February 2013. It provided her with multiple services such as: (1) a program to help develop life skills and parenting skills; (2) parenting classes; (3) domestic violence and crisis management counseling; and (4) anger management counseling. Mother attended the life/parenting skills classes from mid-December 2011 until February 2012, when the service was terminated due to Mother's lack of progress and her inability to maintain a safe home environment where reunification could occur. Additionally, Mother attended only 4 out of 8 anger management classes and was a "no show" for numerous domestic violence and crisis management counseling sessions. While she completed the required parenting classes, she was unable to demonstrate what she learned in these classes. Without notice, she failed to attend numerous scheduled visits with K.L. causing her visitation privileges to be revoked on at least two occasions. When she did visit K.L., she was distant and indifferent to the child's attention and needs. She spent much of her visitation time on her telephone, texting, talking or listening to music. She remained unable to read K.L.'s cues and made inappropriate comments in front of K.L. about giving K.L. to K.L.'s grandmother once Mother resumed custody.

¶39 Additionally, the record reflects that throughout much of this time, Mother failed to provide a safe environment for herself, at times being homeless or living in a hotel room with three other adults, one of whom was a registered sex offender, and two

16

children.  She became involved with at least one other man who physically abused her and repeatedly failed to maintain required communication with her case worker.

¶40 As noted above, the record does not establish when the Department received Dr. Jeffreys' report of her February 2012 evaluation of Mother or when the Department began trying to schedule a psychiatric evaluation or the mental health treatment recommended by Dr. Jeffreys.  We know that at the time of the termination hearing Mother was on a waiting list with multiple providers as a result of the Department's efforts.  Given the severity of Mother's mental, emotional, and cognitive limitations as related by Dr. Jeffreys, it is unlikely that Mother's ability to parent K.L. would have sufficiently improved within the relatively short period of time between removal and termination had the recommended counseling taken place.  Moreover, as Mother was resistant to attending the counseling appointments actually scheduled by the Department, we will not admonish the Department for failing to secure others or for its inability to have Mother moved up on a waiting list.

¶41 The Dissent concludes that the Department failed to use "reasonable efforts" to ensure that Mother received a psychiatric assessment before there could be a determination that her unfitness to parent was unlikely to change within a reasonable time.  Sarah Grotbo, a child protection specialist with the Department and Mother's case worker, testified that she made referrals for psychiatric services to several different providers.  For a psychiatric appointment at Benefis West, the wait was six months, and for Aware Services, the wait was a year.  Section 41-3-423, MCA, obligates the Department to make "reasonable efforts" to reunify families; however, the statue does not

define the term and indeed it would be impossible to do so, as each case must be evaluated on its own facts. But clearly the statute does not require herculean efforts. When faced with balancing the reservations of Dr. Jeffreys about Mother's prospects of being able to parent even with mental health treatment and the substantial time it would take to secure such treatment, against the child's need for permanency and stability, we cannot agree with the Dissent that more "reasonable efforts" were required.

¶42 Considering the paramount importance of K.L.'s best interests and given the abundant evidence presented to the District Court that (1) Mother had not completed the tasks set forth in *her initial treatment plan* between November 2011 and February 2013; (2) Mother's condition was unlikely to change for the better within a reasonable time; and (3) significant bonding had occurred between K.L. and her foster parents and K.L. was experiencing an overall well-being in foster care, the District Court's termination of Mother's parental rights was not an abuse of the court's discretion.

**CONCLUSION**

¶43 We affirm.

/S/ PATRICIA COTTER

We concur:

/S/ MIKE McGRATH
/S/ LAURIE McKINNON
/S/ JIM RICE

18

Justice Beth Baker concurring in part, dissenting in part.

¶44 I concur with the disposition of Father's appeal. I dissent from the Court's decision to uphold the termination of Mother's parental rights because I do not agree that the Department made the statutorily required reasonable efforts to provide her with needed mental health services.

¶45 Because "a natural parent's right to care and custody of a child is a fundamental liberty interest," a district court "must adequately address each applicable statutory requirement" before terminating an individual's parental rights. *In re Matter of A.T.*, 2003 MT 154, ¶ 10, 316 Mont. 255, 70 P.3d 1247. One such requirement is found in § 41-3-423(1), MCA, which provides:

> The department ***shall make reasonable efforts*** to prevent the necessity of removal of a child from the child's home ***and to reunify families that have been separated by the state***. ***Reasonable efforts include but are not limited to*** voluntary protective services agreements, development of individual written case plans specifying state efforts to reunify families, placement in the least disruptive setting possible, ***provision of services pursuant to a case plan***, and periodic review of each case to ensure timely progress toward reunification or permanent placement. In determining preservation or reunification services to be provided and in making reasonable efforts at providing preservation or reunification services, the child's health and safety are of paramount concern. [Emphases added.]

We have observed that "the 'reasonable efforts' inquiry is relevant to abuse and neglect proceedings, in preventing the removal of a child or in working towards reunification of a family separated by the state." *In re D.B.*, 2007 MT 246, ¶ 25, 339 Mont. 240, 168 P.3d 691. The State points out that whether the Department made reasonable efforts is not a separate requirement for termination. But it certainly is not divorced from the analysis. Rather, it is a predicate to finding that the conduct or condition rendering a parent unfit is

19

unlikely to change within a reasonable time—one of the factors that is required for termination of the parent's rights. Section 41-3-609(1)(f)(ii), MCA. Except when reunification efforts are not required by law, which is not the case here, a parent's likelihood of regaining fitness to parent is informed by her progress on the treatment plan after "reasonable efforts" have been made to provide her with the tools to succeed.

¶46 In this case, Mother's approved treatment plan required her to complete a psychological evaluation and to follow the psychologist's recommendations and referrals regarding personal and family counseling. As noted by the Court, that evaluation occurred in February 2012. Dr. Jeffreys found Mother to have both cognitive difficulties and a more serious thought disorder, which would require psychiatric evaluation and treatment. Dr. Jeffreys explained that her diagnostic impressions were "difficult to tease out because it's hard to determine how much is a psychotic disorder and how much is mood disorder, and as she has not been medicated for any psychosis it's difficult to determine which is which." If the mental health issues were under control, Dr. Jeffreys observed, then the cognitive issues would be "more able to be dealt with." But the mental health issues "are much more serious." Dr. Jeffreys did not know whether Mother would be responsive to treatment for her "severe" mental health concerns and, as she is not a psychiatrist, Dr. Jeffreys could not prescribe medication or a course of treatment for those concerns. She testified, "Until [Mother] is properly treated, it's going to be difficult to ascertain exactly what the diagnosis is. Either way, the symptoms are severe and significant and preclude her ability to parent."

20

¶47    The Court responds to this testimony with two conclusions. First, it opines that the treatment plan appropriately required Mother to address her mental health concerns and that various service providers "attempted to help Mother address them" in light of the issues Dr. Jeffreys brought to light. Opinion, ¶ 34. Second, the Court holds that, given the severity of Mother's myriad limitations, "it is unlikely that Mother's ability to parent K.L. would have sufficiently improved within the relatively short period of time between removal and termination had the recommended counseling taken place." Opinion, ¶ 40. I do not believe the necessary factual or legal predicates support these conclusions.

¶48    Angela Meyers, Mother's domestic violence counselor, had not seen Dr. Jeffreys' report but learned some information about it from the Department's caseworker. She testified that she also requested a psychiatric evaluation because she felt "there was more going on with [Mother]" and "wanted her assessed for more intense diagnosis as well as [possible] medication management." Testimony from other witnesses substantiates Dr. Jeffreys' concerns about the extent of Mother's mental health issues. She was noted to have been "mouthing words" to a non-existent person during at least one visitation session and to need "daily assistance" with managing her personal grooming and hygiene and with keeping appointments. The mental health professionals were in agreement that Mother's mental health issues could not be addressed without psychiatric intervention.

¶49    Although the Court points out the testimony of the Department's caseworker at the termination hearing that she had placed Mother on waiting lists for a psychiatric evaluation, she did not indicate when those referrals were made. Dr. Jeffreys' evaluation occurred in February 2012 and the termination hearing was not until a year later; Grotbo

21

testified at the June 2012 hearing on the motion to extend temporary legal custody that she had received Dr. Jeffreys' recommendations and Mother had contacted her about moving forward on them. There was no testimony that efforts had been made at that time to get Mother in to see a psychiatrist. Given the testimony at the termination hearing, had the referral been made when recommended, Mother likely could have been evaluated well before that hearing.

¶50 If Dr. Jeffreys is correct that Mother's underlying mental health issues are "severe," counseling alone is not going to address them. Moreover, given her "serious" limitations, Mother should not be faulted for not getting herself to a psychiatrist when even the Department could only get her on a waiting list. Without any assessment of her psychiatric condition, the list of Mother's failures the Court recounts in ¶¶ 38-40 of its Opinion cannot be considered conclusive of whether Mother's condition likely could change within a reasonable time if her underlying mental illness were treated. Until that "reasonable effort" is made and mental health treatment is explored, it is premature to conclude that Mother could not regain fitness to parent.

¶51 Further, that the child has been in foster care for many months is not insignificant, but it also is not dispositive. The Court correctly observes that the law requires a petition to terminate parental rights to be filed if a child has been in foster care for fifteen of the most recent twenty-two months, unless "the department has not provided the services considered necessary for the safe return of the child to the child's home." Section 41-3-604(1)(b), MCA.

22

¶52    There are no easy decisions in these tragic cases. Courts struggle with balancing the child's interest in permanency and stability against the parent's fundamental liberty interests. All too often, mental health issues contribute to a parent's inability to provide for the needs of her child; I recognize the challenges the Department faces to make limited services available to a growing number of parents facing these and similar obstacles. I have struggled in this case, knowing that K.L. has been in a foster placement for well over two years and is thriving in her current home and that, under the best of circumstances, Mother has a long road ahead. There are times, however, when the Court must recognize that the parent has not received what the law guarantees before her rights may be terminated. In this case, the law demanded that Mother receive an adequate psychiatric assessment before the Court could make a finding that the conditions rendering her unfit were unlikely to change within a reasonable time.

¶53    Accordingly, I would reverse the order terminating N.W.'s parental rights and remand for further proceedings.

/S/ BETH BAKER