No. 92-567

IN THE SUPREME COURT OF THE STATE OF MONTANA

1993

IN THE MATTER OF INQUIRY INTO

BABY GIRL JANE DOE,

     Youth in Need of Care.



FILED

DEC 07 1993

Ed Smith

CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:  District Court of the Twelfth Judicial District,
In and for the County of Hill,
The Honorable John Warner, Judge presiding.

COUNSEL OF RECORD:

     For Appellant:

          Stephen A. Doherty, Monteau, Guenther & Decker,
Great Falls, Montana (Chippewa Cree Tribe)

     For Respondent:

          David G. Rice, Hill County Attorney, Patricia
Jensen, Deputy County Attorney, Havre, Montana;
Lawrence A. LaFountain, Attorney at Law, Havre,
Montana (Guardian Ad Litem); Thomas J. Sheehy,
Attorney at Law, Big Sandy, Montana (mother)

Submitted on Briefs:  November 1, 1993

Decided:  December 7, 1993

Filed:

                    Clerk

Justice Terry N. Trieweiler delivered the opinion of the Court.

The Hill County Department of Family Services filed a petition in the District Court for the Twelfth Judicial District in Hill County for an order terminating the parental rights of the natural parents of Baby Girl Jane Doe, granting permanent legal custody of the child to the Montana Department of Family Services (DFS), and giving the DFS the right to consent to her adoption. The Chippewa Cree Tribe of the Rocky Boy's Indian Reservation intervened and moved for disclosure of the natural mother's identity in order to assure that any child placement conformed to the preferences provided for in the Indian Child Welfare Act found at 25 U.S.C. §§ 1901 to 1963 (1978). The District Court denied the Tribe's motion based on the natural mother's stated preference for anonymity and certified its order as final pursuant to Rule 54(b), M.R.Civ.P. The Tribe appeals the District Court's order. We reverse the District Court.

The issue on appeal is whether a parent's interest in anonymity, which is to be considered pursuant to 25 U.S.C. § 1915(c) of the Federal Indian Child Welfare Act (ICWA), prevails when in conflict with the Tribe's right to enforce the preferences for placement of Indian children provided for in § 1915(a) and (b) of the Act.

### FACTUAL BACKGROUND

Baby Girl Jane Doe was born at the Northern Montana Hospital in Havre, Montana, on May 5, 1992. She is of Indian descent and

2

eligible for membership in the Chippewa Cree Tribe on the Rocky Boy's Indian Reservation.

After the child's birth, Baby Girl Jane Doe's mother left the hospital, refused to sign the birth certificate, and expressed the intention to relinquish her to the Hill County Department of Family Services.

On May 8, 1992, the Hill County Attorney filed a petition for temporary investigative authority and protective services with the District Court in Hill County on behalf of the Hill County Department of Family Services. He alleged that Baby Girl Jane Doe was dependent, or in danger of becoming dependent within the meaning of § 41-3-102, MCA, by reason of her mother's conduct and intentions and alleged that the child's father was unknown. The petition asked that the Hill County Department of Family Services be granted authority to take the child from the hospital for placement in a foster home until the mother could sign a relinquishment of parental rights, and that the public defender be appointed as the child's guardian ad litem. On that same date, the District Court issued its order finding Baby Girl Jane Doe dependent within the meaning of § 41-3-102, MCA, granting the Hill County Department of Family Services authority to take her from the hospital for placement in a foster home, and appointing a guardian ad litem.

On May 10, 1992, court records indicate that the DFS entered into an agreement with a married couple residing in Helena, Montana, who agreed to accept the child on a foster care basis

3

until she was available for final adoption. The agreement expressed an understanding that the DFS did not yet have legal authority to consent to adoption because, among other reasons, tribal consent had not yet been obtained, and the foster parents expressed an understanding that the child may yet have to be removed from their home and placed elsewhere.

On May 20, 1992, the child's natural mother filed with the District Court an affidavit waiving all parental rights, relinquishing custody of her child to the DFS, and consenting to her adoption without further notice or consent. She indicated in her affidavit that she had been advised of the Indian Child Welfare Act, but for reasons of privacy, wished to remain anonymous and requested that the court not contact her family or Tribe concerning placement. A minute entry also indicates that she appeared in court that day, along with the county attorney, and her child's guardian ad litem. She was advised of her rights and the consequences of her relinquishment. The court then concluded that her relinquishment, waiver, and consent were given knowingly and of her own free will.

On that date, the court also indicated that the temporary order for protective services would remain in effect until the child was placed permanently for adoption, but that the Chippewa Cree Tribe should be notified that a child eligible for enrollment as a member was being adopted.

On June 11, 1992, the Tribe was formally notified that voluntary child custody proceedings were now pending in the

4

District Court for Hill County and was advised of its right to intervene in the proceeding pursuant to 25 U.S.C. § 1911. The Tribe was advised that the potential outcome of the proceedings, unless there was intervention, would be an order awarding permanent legal custody to the DFS, which would then place the child in a permanent adoptive home.

On June 11, 1992, the District Court issued its order in which it held that Baby Girl Jane Doe was a youth subject to termination of the parent-child relationship within the meaning of § 41-3-609, MCA, and that her best interest would be served by declaring her in need of care and awarding her custody to the DFS, along with lawful authority for that agency to consent to her adoption. Based on that conclusion, the District Court set a hearing on the DFS's petition for permanent custody of Baby Girl Jane Doe. Notice of that hearing was also sent to the Tribe.

On June 23, 1992, the Chippewa Cree Tribe of the Rocky Boy's Reservation moved to intervene in this matter for the purpose of assuring compliance with the ICWA. That motion was later granted by the District Court.

On August 18, 1992, at the hearing held to consider the DFS petition for permanent custody, the Tribe requested information about the identity of Baby Girl Jane Doe's natural mother and her family so that it could determine whether the child could be placed with her extended family pursuant to the preferences provided for in 25 U.S.C. § 1915(a) and (b). Since the Tribe's request conflicted with the mother's request for anonymity, the District

Court ordered further briefing. After consideration of the parties' arguments, the District Court concluded that the mother's right to anonymity, provided for in 25 U.S.C. § 1915(c) outweighed the Tribe's interest in enforcing the statutory preferences for placement, and denied the Tribe's motion to reveal the mother's identity.

The District Court concluded that, while bound by the preferences provided in 25 U.S.C. § 1915(a), it also had to give consideration to the parent's request for anonymity under 25 U.S.C. § 1915(c). It further concluded that based on the notice provided to the Tribe, and the information it had already received about the pre-adoptive family, it had the ability to satisfy itself that the applicable preferences were being considered by the court and to propose a more appropriate placement if it desired to do so. The court concluded that the purposes of the ICWA could be satisfied without revealing the identity of Baby Girl Jane Doe's natural mother. The court also concluded that identity of the child's father was unknown.

Final judgment was entered denying the Tribe's motion, and that judgment was certified as final pursuant to Rule 54(b), M.R.Civ.P. The Tribe then appealed from the District Court's order.

## DISCUSSION

Does a parent's interest in anonymity, which is to be considered pursuant to 25 U.S.C. § 1915(c) of the Federal Indian Child Welfare Act (ICWA), prevail when in conflict with the Tribe's

6

right to enforce the preferences for placement of Indian children provided for in § 1915(a) and (b) of the Act?

The Indian Child Welfare Act was enacted by Congress in 1978 for the principal purpose of protecting the integrity of Indian tribes by preventing, where possible, the removal of Indian children and placement in non-Indian homes. After extended hearings over a number of years, Congress made the following findings set forth at 25 U.S.C. § 1901, which formed the basis for enactment of the ICWA:

> (2) that Congress . . . has assumed the responsibility for the protection and preservation of Indian tribes and their resources;
>
> (3) that there is no resource that is more vital to the continued existence and integrity of Indian tribes than their children . . .
>
> (4) that an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies and that an alarmingly high percentage of such children are placed in non-Indian foster and adoptive homes and institutions; and
>
> (5) that the States, exercising their recognized jurisdiction over Indian child custody proceedings through administrative and judicial bodies, have often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families.

In 25 U.S.C. § 1902 Congress also set forth a specific declaration of congressional policy which was as follows:

> The Congress hereby declares that it is the policy of this Nation to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect

7

the unique values of Indian culture, and by providing for assistance to Indian tribes in the operation of child and family service programs.  [Emphasis added].

Section 1911(c) of the Act provided that:

In any State court proceeding for the foster care placement of, or termination of parental rights to, an Indian child, the Indian custodian of the child and the Indian child's tribe shall have a right to intervene at any point in the proceeding.

In order to make intervention more meaningful, § 1912(c) provides that:

Each party to a foster care placement or termination of parental rights proceeding under State law involving an Indian child shall have the right to examine all reports or other documents filed with the court upon which any decision with respect to such action may be based.

It is apparent from the plain language of the aforementioned statutes that a principal purpose of the ICWA is to protect the stability of Indian tribes by preventing adoption of Indian children by non-Indians where placement in Indian families is possible.  It is also apparent that by granting tribes the right to intervene as parties in any proceeding involving the placement of Indian children, Congress intended to recognize the strong interest of tribes, as distinct from their individual members, in the placement of Indian children.  Congress's intent is further clarified by 25 U.S.C. § 1915 which gives rise to the dispute in this case.  Subsections (a) and (b) of § 1915, which are relied on by the Tribe, provide in relevant part as follows:

(a)  . . . In any adoptive placement of an Indian child under State law, a preference shall be given, in the absence of good cause to the contrary, to a placement with (1) <u>a member of the child's extended family</u>;

8

(2) other members of the Indian child's tribe; or
(3) other Indian families.

    (b) . . . In any <u>foster care</u> or <u>pre-adoptive placement</u>, a preference shall be given, in the absence of good cause to the contrary, to a placement with--

    (i) <u>a member of the Indian child's extended family</u>;

    (ii) a foster home licensed, approved, or specified by the Indian child's tribe;

    (iii) an Indian foster home licensed or approved by an authorized non-Indian licensing authority; or

    (iv) an institution for children approved by an Indian tribe or operated by an Indian organization which has a program suitable to meet the Indian child's needs. [Emphasis added].

Subsection (c) of § 1915, which was invoked by Baby Girl Jane Doe's natural mother and relied on by the District Court, provides in relevant part that:

Where appropriate, the preference of the Indian child or parent shall be considered: Provided, That where a consenting parent evidences a desire for anonymity, the court or agency shall give weight to such desire in applying the preferences.

On appeal, the Tribe contends that its right to intervene and advocate enforcement of the statutory preferences for placement is meaningless when the first preference is for placement with the child's extended family and the court will not reveal the identity of the child's natural parent.

The DFS, on the other hand, asserts, and the District Court agreed, that the natural parent's interest in anonymity has greater significance and it is binding on the court when it is invoked.

In order to reconcile two provisions of the ICWA, which are potentially in conflict, we must determine how to best effectuate

9

the principal purpose for which the Act was created. Since we are construing a federal act, we look for guidance to the United States Supreme Court's leading and most recent interpretation found in *Mississippi Band of Choctaw Indians v. Holyfield* (1989), 490 U.S. 30, 109 S. Ct. 1597, 104 L. Ed. 2d 29. In that case, twin babies were born to Indian parents who were residents of their reservation. The birth took place at a point 200 miles distant from the reservation. The parents consented to adoption by non-Indian parents, and an adoption decree was entered in the state court.

The tribe to which the parents belonged moved the court to vacate the adoption decree on the ground that under the ICWA exclusive jurisdiction was vested in the tribal court. That motion was denied on the basis that the children's parents had gone to great lengths to see that they were born off the reservation and had expressed a preference for the adoption that was decreed. The Mississippi Supreme Court affirmed the decision of its chancery court, and the U.S. Supreme Court granted plenary review.

In its decision to reverse the Mississippi court, the U.S. Supreme Court discussed at length the legislative history of the ICWA. Based on that history, it concluded that:

> The most important substantive requirement imposed on state courts is that of § 1915(a), which, absent "good cause" to the contrary, mandates that adoptive placements be made preferentially with (1) members of the child's extended family, (2) other members of the same tribe, or (3) other Indian families.
>
> The ICWA thus, in the words of the House Report accompanying it, "seeks to protect the rights of the Indian child as an Indian and the rights of the Indian community and tribe in retaining its children in its

10

society." House Report, at 23, U.S. Code Cong. & Admin. News 1978, at 7546. It does so by establishing "a Federal policy that, where possible, an Indian child should remain in the Indian community," ibid., and by making sure that Indian child welfare determinations are not based on "a white, middle-class standard which, in many cases, forecloses placement with [an] Indian family." [Emphasis added].

*Mississippi Choctaw*, 490 U.S. at 36-37, 109 S. Ct. at 1602, 104 L. Ed. 2d at 39.

In arriving at its decision, the U.S. Supreme Court found it necessary, as we must, to reconcile the rights and preferences of individual tribal members with the clear statutory rights of the tribe. In doing so, it made the following points, which are set forth at length because of their particular significance to our conclusion:

> Nor can the result be any different simply because the twins were "voluntarily surrendered" by their mother. Tribal jurisdiction under § 1911(a) was not meant to be defeated by the actions of individual members of the tribe, for <u>Congress was concerned not solely about the interests of Indian children and families, but also about the impact on the tribes themselves of the large numbers of Indian children adopted by non-Indians.</u> See 25 U.S.C. §§ 1901(3) [25 U.S.C.S. § 1901(3)] ("[T]here is no resource that is more vital to the continued existence and integrity of Indian tribes than their children"), 1902 ("promote the stability and security of Indian tribes"). The numerous prerogatives accorded the tribes through the ICWA's substantive provisions, e.g., §§ 1911(a) (exclusive jurisdiction over reservation domiciliaries), 1911(b) (presumptive jurisdiction over non-domiciliaries), 1911(c) (right of intervention), 1912(a) (notice), 1914 (right to petition for invalidation of state-court action), 1915(c) (right to alter presumptive placement priorities applicable to state-court actions), 1915(e) (right to obtain records), 1919 (authority to conclude agreements with States), must, accordingly, be seen as a means of protecting not only the interests of individual Indian children and families, but also of the tribes themselves.

11

In addition, it is clear that Congress' concern over the placement of Indian children in non-Indian homes was based in part on evidence of the detrimental impact on the children themselves of such placements outside their culture. Congress determined to subject such placements to the ICWA's jurisdictional and other provisions, even in cases where the parents consented to an adoption, because of concerns going beyond the wishes of individual parents. As the 1977 Final Report of the congressionally established American Indian Policy Review Commission states, in summarizing these two concerns, "[r]emoval of Indian children from their cultural setting seriously impacts a long-term tribal survival and has damaging social and psychological impact on many individual Indian children." Senate Report, at 52.

These congressional objectives make clear that a rule of domicile that would permit individual Indian parents to defeat the ICWA's jurisdictional scheme is inconsistent with what Congress intended. See *In re Adoption of Child of Indian Heritage*, 111 N.J. 155, 168-171, 543 A.2d 925, 931-933 (1988). The appellees in this case argue strenuously that the twins' mother went to great lengths to give birth off the reservation so that her children could be adopted by the Holyfields. But that was precisely part of Congress' concern. Permitting individual members of the tribe to avoid tribal exclusive jurisdiction by the simple expedient of giving birth off the reservation would, to a large extent, nullify the purpose the ICWA was intended to accomplish. [Footnotes omitted; Emphasis added].

*Mississippi Choctaw*, 490 U.S. at 49-51, 109 S. Ct. at 1608-10, 104 L. Ed. 2d at 47-48.

It is clear from the legislative findings and expression of policy, and the U.S. Supreme Court's application of the ICWA in *Mississippi Choctaw*, that the principal purposes of the Act are to promote the stability and security of Indian tribes by preventing further loss of their children; and to protect the best interests of Indian children by retaining their connection to their tribes.

12

The principal statutory method by which these purposes are achieved is the order of preferences set forth in 25 U.S.C. § 1915(a) and (b), and the Tribe's right to intervene in order to enforce those preferences. While a parent's wish for anonymity can be considered where not otherwise in conflict with the Act's principal purposes, it cannot be allowed to defeat the purposes for which this Act was created.

To give primary importance to the mother's request for anonymity would defeat the Tribe's right to meaningful intervention and possibly defeat application of the clear preference provided by statute for placement of Baby Girl Jane Doe with a member of her extended family.

The dissent concedes that the Tribe had a right to intervene in this proceeding and that the order of preference applies to either adoptive placement, pre-adoptive placement, or placement for foster care. However, the dissent contends that since the DFS already obtained a temporary custody award and placed the child in foster care before the Tribe was notified and had an opportunity to object, that the Tribe cannot now object to an improper placement, even though they are now a party to this action. The dissent goes on to argue that the court had not yet considered permanent adoptive placement, and therefore, the Tribe's concerns about the mother's identity are premature. However, the Tribe's rights would be hollow indeed if they were lost by failure of the State to timely notify it of foster placement. Furthermore, the proceeding which gave rise to this appeal was not just a proceeding for

13

termination of parental rights--it was also a proceeding to show cause why permanent custody of Baby Girl Jane Doe should not be awarded to the DFS with authority to consent to her adoption without further notice. The possible outcome from this proceeding was pre-adoptive placement of the child with the DFS on a permanent basis, as opposed to the temporary custody which had previously been granted. This is exactly the kind of pre-adoptive placement contemplated by 25 U.S.C. § 1915(b).

Therefore, we reverse the order of the District Court and hold that 25 U.S.C. § 1915(a) and (b) requires that in this proceeding the Chippewa Cree Tribe of the Rocky Boy's Indian Reservation be informed of the identity of Baby Girl Jane Doe's natural mother and her extended family. To the extent possible, without interfering with the aforementioned rights of the Tribe, the natural mother's right to privacy should be respected throughout these proceedings.

This case is remanded to the District Court for further proceedings consistent with this opinion.

_____
                    Justice

We concur:


_____
        Chief Justice

_____

_____

_____
Justices

Justice Karla M. Gray, concurring in part and dissenting in part.

I agree entirely with the Court's determination that the Tribe's right to enforce the preferences for placement of Indian children provided in the Indian Child Welfare Act outweighs a parent's request for anonymity. To allow a parent's wish for anonymity to outweigh the Tribe's right to ensure that the statutory preferences are applied would defeat the purposes of the Act.

I respectfully dissent, however, from the Court's holding that the Act requires that the identity of Baby Girl Jane Doe's mother be revealed "in this proceeding." As the Court correctly states, § 1911(c) gives the Tribe the right to intervene in this proceeding for termination of parental rights. It is my view, however, that the proceeding at issue here is neither an adoptive placement under § 1915(a), nor a foster care or pre-adoptive placement under § 1915(c). No placement--either foster care, pre-adoptive placement, or adoptive placement--is occurring in this proceeding for termination of parental rights. Pursuant to Montana procedures, the foster care or pre-adoptive placement occurred almost immediately after Baby Girl Jane Doe's birth. No court proceedings were necessary for that placement under Montana law.

The adoption proceeding concerning this child is yet to come. Indeed, given Montana statutes and the location of the residence of the potential adoptive parents, the actual adoption proceeding will take place in another judicial district. It is in that proceeding, I submit, that the Tribe can and should assert its rights to the identity of this child's mother in order to ensure proper

application of the Act's preferences. Requiring the Tribe to do so at that point is entirely consistent with both the Act and the U.S. Supreme Court's conclusion in _Mississippi Choctaw_, quoted by the Court today, that "[t]he most important substantive requirement on state courts is that of § 1915(a), which, absent 'good cause' to the contrary, mandates that <u>adoptive placements</u> be made preferentially with (1) members of the child's extended family, (2) other members of the same tribe, or (3) other Indian families." (Emphasis added.) For that reason, I believe that it is inappropriate to consider the merits of the issue raised by the parties, namely, whether the interests of the Tribe in knowing the identity of the parent outweigh the parent's interest in anonymity.

_____
Justice

Justice John Conway Harrison joins in the foregoing concurrence and dissent of Justice Karla M. Gray.

_____
Justice

Chief Justice J. A. Turnage joins in the opinion of Justice Gray.

_____
Chief Justice

December 7, 1993

## CERTIFICATE OF SERVICE

I hereby certify that the following order was sent by United States mail, prepaid, to the following named:

Stephen A. Doherty
Monteau, Guenther & Decker
410 Central, Ste. 522
Great Falls, MT 59401

David G. Rice, County Attorney
Patricia Jensen, Deputy
P.O. Box 912
Havre, MT 59501

Lawrence LaFountain
Attorney at Law
305 Third Ave.
Havre, MT 59501

Thomas Sheehy
Attorney at Law
P.O. Box 511
Big Sandy, MT 59520

Brenda Top Sky
Chippewa Cree Tribe
Rocky Boy Route, Box 544
Box Elder, MT 59521

ED SMITH
CLERK OF THE SUPREME COURT
STATE OF MONTANA

BY: _____
    Deputy