No. 03-148

IN THE SUPREME COURT OF THE STATE OF MONTANA

2003 MT 308

IN THE MATTER OF C.H., S.H., and D.H.,

    Youths in Need of Care.

APPEAL FROM:    District Court of the Thirteenth Judicial District,
In and For the County of Yellowstone, Cause No. DN 2000–08,
Honorable Susan P. Watters, Presiding Judge

COUNSEL OF RECORD:

    For Appellant:

    Dorothea Boniello, LaRance, Syth & Associates, P.C., Billings, Montana

    For Respondent:

    Honorable Mike McGrath, Attorney General; Ilka Becker, Assistant
Attorney General, Helena, Montana

    Dennis Paxinos, County Attorney; Richard Helm, Deputy County
Attorney, Billings, Montana

    Patrick Kenney, Attorney at Law, Billings, Montana (Guardian Ad Litem)

    Kevin T. Sweeney, Attorney at Law, Billings, Montana (For Father of C.H.)

    Connie Camino, Attorney at Law, Billings, Montana (For Father of S.H.)

    Nancy Wetherelt, Attorney at Law, Hardin, Montana (For Father of D.H.)

Submitted on Briefs:  September 11, 2003

Decided:  November 7, 2003

Filed:

_____
Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

¶1 "Mother," the natural mother of C.H., S.H., and D.H., appeals the Thirteenth Judicial Court's order of September 17, 2002, terminating her parental rights. The District Court adjudicated the three children youths in need of care and terminated the parental rights of Mother, as well as the parental rights of the respective fathers of each of the children. Only Mother's rights are at issue on appeal. We affirm the order of the District Court.

¶2 Mother raises the following issues on appeal:

1. Does the Indian Child Welfare Act apply to the termination of Mother's rights to C.H. and D.H.?

2. Did the District Court abuse its discretion when it terminated Mother's parental rights?

Factual Background

¶3 In 1992, Mother initiated contact with the Department of Health and Human Services (the Department) because her oldest child, C.H.–who was then approximately twenty months old–was uncontrollable. Since that time, Mother has had two more children, S.H., and D.H., and the Department has continued to provide Mother with parenting skills classes and other services. Visits to Mother's home revealed a situation of chaos and dysfunction. The home was extremely messy and cluttered, with dirty dishes, old dried food, clothes and paper all over. The Department responded to numerous reports of Mother's poor judgment and physical altercations amongst Mother and the children.

¶4     Numerous mental health care professionals have interacted with the family members. They report that although Mother can recite the lessons from parenting skills classes, she displays a lack of decision-making ability. She does not know what needs to be done in the next minute, hour or day. She misses the significance, severity and intensity of nonverbal cues from her children. This results in a situation of neglect. Because of wild behavior, each of the children has received various psychological diagnoses. C.H. was removed from Mother's care in April 2000. S.H. was removed in October 2000, and D.H. was removed in March 2001. By all accounts, now placed in structured and stable environments, the children are doing better outside of Mother's care.

¶5     From January 2001 to July 2002, Mother had three different court-approved treatment plans. Each plan required Mother to deal with her own mental health issues so that she would be able to provide a safe, structured and stable environment for the children. The plans had different benchmarks, such as being on time and attending all meetings for herself and her children, submitting to urine analysis for drugs, allowing her mental health care providers to share information with the Department, and keeping her house clean. The social worker who devised the plans did not think Mother had successfully completed the plans. None of the professionals who testified at the hearing were in favor of Mother keeping her parental rights.

¶6     Also at issue is the Native American heritage of two of the children. At the hearing, the Department provided Mylene Widner as a possible expert. Widner is an enrolled member of the Crow Indian Tribe and is also a descendant of the Little Shell Band of the

Chippewa. Based on her familiarity with the Little Shell and her review of the record, Widner testified to the following. C.H.'s father qualifies and is enrolled for membership in the Little Shell Band of the Chippewa, based on his one-quarter blood quantum, the minimum blood quantum necessary to qualify for membership. C.H. has one-eighth blood quantum and does not qualify for membership. Widner also explained that the abuse and neglect of C.H. was not related to any Little Shell custom or tradition.

¶7 After the conclusion of the termination hearing, the District Court ordered briefs concerning the Indian Child Welfare Act, 25 U.S.C. §§ 1901-1923 ("ICWA") issues. Only the Department filed a brief. Based on all of its knowledge of the case, the Department only addressed the Indian heritage of C.H. On Mother's proposed findings of fact and conclusions of law, her counsel included a footnote stating that she had been told that D.H.'s father was an enrolled member of the Northern Cheyenne Tribe. This was the first and only indication that D.H. may be a Native American. On appeal, Mother raises ICWA issues for both C.H. and D.H.

Standard of Review

¶8 We review a District Court's decision to terminate parental rights to determine whether the District Court abused its discretion. *In re A.F.,* 2003 MT 254, ¶ 12, 317 Mont. 367, ¶ 12, 77 P.3d 266, ¶ 12. The test for abuse of discretion is "whether the trial court acted arbitrarily, without employment of conscientious judgment, or exceeded the bounds of reason resulting in substantial injustice." *In re D.V.,* 2003 MT 160, ¶ 14, 316 Mont. 282, ¶ 14, 70 P.3d 1253, ¶ 14. A district court must make specific fact findings in accordance with

4

statutory requirements before terminating parental rights. *In re J.V.,* 2003 MT 68, ¶ 7, 314 Mont. 487, ¶ 7, 67 P.3d 242, ¶ 7. We review those findings of fact to determine whether they are clearly erroneous, and we review conclusions of law to determine whether the court correctly interpreted the law. *In re J.V., ¶ 7.*

¶9 A parent's right to the care and custody of a child is a fundamental interest. However, a court's paramount concern in a parental rights termination proceeding is the best interest of the children. *In re D.V., ¶ 15.* Primary consideration shall be given to the physical, mental, and emotional conditions and needs of the children. Section 41-3-609(3), MCA.

Discussion

¶10 1. Does the Indian Child Welfare Act apply to the termination of Mother's rights to C.H. and D.H.?

*A. Policy of ICWA and applicable rules.*

¶11 The principal purpose of ICWA is to "promote the stability and security of Indian tribes by preventing further loss of their children; and to protect the best interests of Indian children by retaining their connection to the tribes." *In re Baby Girl Doe* (1993), 262 Mont. 380, 388, 865 P.2d 1090, 1095. Congress's declaration of policy for ICWA states:

> The Congress hereby declares that it is the policy of this Nation to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture, and by providing for assistance to Indian tribes in the operation of child and family service programs.

5

25 U.S.C. § 1902. ICWA is clear and unambiguous that "there is no resource that is more vital to the continued existence and integrity of Indian tribes than their children." 25 U.S.C. § 1901(3). ICWA recognizes the unique and privileged interest that Indian tribes have in the welfare and upbringing of Indian children.

¶12 For the purpose of ICWA, an "Indian Child" is defined as:

> any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe.

25 U.S.C. § 1903(4).

¶13 For ICWA to apply, the Indian tribe in question must be recognized by the Secretary of the Interior as eligible for services provided to Indians by the Secretary. 25 U.S.C. § 1903(8) and (11).

¶14 In state court proceedings for the termination of parental rights of Indian children, notice must be given to the Indian child's tribe. 25 U.S.C. § 1912. Any parent from whose custody a child was removed may petition any court of competent jurisdiction to invalidate such action based on the lack of proper notice to the tribe, 25 U.S.C. § 1914. Furthermore, ICWA provides:

> In any State court proceeding for the foster care placement of, or termination of parental rights to, an Indian child, the Indian custodian of the child and the Indian child's tribe shall have a right to intervene at any point in the proceeding.

25 U.S.C. § 1911(c).

6

*B. ICWA analysis for C.H.*

¶15     The Department contends that ICWA does not apply in the present case. However, in an abundance of caution, the Department had Mylene Widner testify as an ICWA expert. Widner is a descendant of the Little Shell Band of the Chippewa and is an enrolled member of the Crow. Widner testified that she was familiar with the Little Shell standards for membership and their child-rearing practices. Her testimony was also based on her review of the record.

¶16     According to Widner, C.H.'s father qualifies for enrollment as a member of the Little Shell Band of the Chippewa by dint of his one-quarter blood quantum, the tribe's minimum standard. C.H., however, only has one-eighth blood quantum and does not qualify for enrollment. Furthermore, Widner testified that the Little Shell Band is not a federally recognized tribe.

¶17     We conclude ICWA does not apply to C.H. for two reasons. First, C.H. is not an Indian child as defined by ICWA. ICWA requires that a child be eligible for membership in the tribe. C.H. is not eligible because of her insufficient blood quantum. Second, ICWA does not apply to tribes which have not yet been federally recognized. Although other bands of Chippewa are recognized, the Little Shell Band is not currently recognized by the Secretary of the Interior as eligible to receive services. 67 Fed. Reg. 46,328 (July 12, 2002).

*C. ICWA analysis for D.H.*

¶18     Prior to the proposed findings of fact there was no indication from any of the parties or witnesses that one of the children other than C.H. might have qualified as an Indian Child

under ICWA. We note that the initial order to show cause included notice of ICWA and was served on both Mother and R.H., the natural father of D.H. The notice briefly summarized the rights afforded under ICWA, and specifically stated, "your children's Indian Tribe will be contacted if you have made it known which Tribe your children are enrolled in or is [sic] enrollable in." Mother raised the ICWA issue in regard to D.H. in her proposed findings of fact and conclusions of law in a footnote, which stated: "[Mother] has not alleged that she is a member of an Indian Tribe, however, the undersigned counsel has been verbally advised that [R.H.], [D.H.]'s father is an enrolled member of the Northern Cheyenne Tribe." The record reveals minimal participation of R.H. Although he was served with the order vacating and resetting permanent custody hearing, he did not appear at the hearing. His court-appointed counsel indicated R.H. did not want to parent D.H. or to work with the Department. He did not sign his treatment plans. Thus, we are faced with a situation where an important and legally significant fact was not effectively raised until after the trial was over and the appeal was brought.

¶19    Normally, issues not raised at the trial court will not be addressed by this Court. *See In re G.S.,* 2002 MT 245, ¶ 48, 312 Mont. 108, ¶ 48, 59 P.3d 1063, ¶ 48. "It is fundamentally unfair to fault the trial court for failing to rule correctly on an issue it was never given the opportunity to consider." *City of Missoula v. Campbell,* 2001 MT 271, ¶ 13, 307 Mont. 286, ¶ 13, 37 P.3d 670, ¶ 13. Mother cites no authority which would allow her to invalidate the termination proceedings with nothing more than a belated footnote raising the possibility of D.H.'s Indian child status. We will not overturn a child termination proceeding for failure

8

to comply with ICWA when neither the Department nor the District Court had any notice of the possibility that the child might qualify as an Indian child, the child's alleged Indian father gave no indication of Indian heritage or interest in the child, and the mother did not give timely notice of the potential issue.

¶20    ICWA only requires notice to the tribe when "the court knows or has reason to know that an Indian child is involved." 25 U.S.C. § 1912(a). The Bureau of Indian Affairs has issued nonbinding guidelines to assist courts in interpreting the foregoing. *Mississippi Band of Choctaw Indians v. Holyfield* (1989), 490 U.S. 30, 53, 109 S.Ct. 1597, 1610, 104 L.Ed.2d 29, 49; and *In re M.G.,* 2003 MT 60, ¶ 10, 314 Mont. 396, ¶ 10, 66 P.3d 312, ¶ 10, *citing to* 44 Fed. Reg. 67,584 to 67,585 (1979). The guidelines list "[c]ircumstances under which a state court has reason to believe a child involved in a child custody proceeding is an Indian include but are not limited to the following," the last of which is "[a]n officer of the court involved in the proceeding has knowledge that the child may be an Indian child." Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed. Reg. at 67,586. Attorneys are officers of the court. *See, e.g., Steele v. McGregor,* 1998 MT 85, ¶ 28, 288 Mont. 238, ¶ 28, 956 P.2d 1364, ¶ 28. If we were to give a strict interpretation to this guideline, the knowledge of Mother's counsel that D.H. might qualify as an Indian Child would arguably be sufficient to undermine the entire termination proceeding. However, the guidelines are not binding but are intended to assist state courts in application of ICWA. 44 Fed. Reg. 67,584-585. We have previously determined the guidelines are persuasive authority. *In re M.R.G.,* ¶ 10. Because ICWA is a remedial statute, its terms should be liberally construed

9

to achieve their purpose. One purpose of ICWA is to afford tribes the opportunity to intervene by providing that tribes receive notice *before* proceedings begin. *In re Adoption of Riffle* (1995), 273 Mont. 237, 241, 902 P.2d 542, 544 (citing 25 U.S.C. § 1912). In the present case, this purpose could not be honored because the court did not know or have reason to know of the possibility of D.H.'s Indian heritage until *after* the termination hearing had concluded. As pointed out below, this is not to say that, if D.H.'s Indian heritage qualifies under ICWA, the tribe may not participate in future proceedings concerning D.H.'s placement.

¶21 Although we deny Mother's ICWA claim, we recognize the inherent remedial character of ICWA and that we have a "responsibility to promote and protect the unique Indian cultures of our state for future generations of Montanans." *In re K.H. and K.L.E.,* 1999 MT 128, ¶ 20, 294 Mont. 466, ¶ 20, 981 P.2d 1190, ¶ 20. It behooves us to take great pains to ensure that the prerequisites of ICWA have been satisfied. *In re K.H.,* ¶ 29. ICWA protects the best interests of Indian children by making sure that their unique cultural heritage is taken into account. ICWA gives rights not only to parents of Indian children, but also to their tribe(s). *In re C.H.*, 2000 MT 64, 299 Mont. 62, 997 P.2d 776; 25 U.S.C. § 1914. ICWA recognizes that tribes have a unique interest and ability to provide services in the upbringing of Indian children.

¶22 One very valid reason to give notice to the tribe is so that it may become involved in the upbringing of its members and be allowed to provide the services for which it is uniquely situated to provide. Also, in considering the best interests of the child in question, a court

will necessarily consider the child's ethnic and cultural heritage. But here, faced with a silent record, we have no idea whether or not D.H. even qualifies as an Indian child, and if he does, whether the tribe is interested in being involved in his case, and if it is, whether the tribe might be able to locate extended family members who would be able to provide the level of care necessary for D.H. If D.H. does qualify as an Indian child and his tribe is interested in participating in placement proceedings, it should be afforded the opportunity to do so even though the proceeding for termination of parental rights has already transpired and concluded. "Even if a tribe fails to intervene at the beginning of a proceeding, it is not precluded from intervening at a later point in the absence of an express waiver of the right to intervene." *Adoption of Riffle,* 273 Mont. at 241, 902 P.2d at 545.

¶23 Although the District Court did not know for the purposes of § 1912 that D.H. might be an Indian child for the termination proceeding, we conclude that for any future proceeding regarding D.H., this appeal itself sufficiently puts the District Court and the Department on notice that D.H. might be an Indian child. Accordingly, notice must be given to the Northern Cheyenne so that it may determine whether or not D.H. is or is not an Indian child. Only after that determination has been made, and the tribe has been given actual notice and a chance to become involved, will it be possible to determine what subsequent ICWA proceedings are appropriate, if any.

¶24 2. Did the District Court exercise proper discretion in terminating Mother's parental rights?

11

¶25    The District Court found that termination of Mother's parental rights was proper pursuant to § 41-3-609(1)(b) and (f), MCA, which provide:

> (1) The court may order a termination of the parent-child legal relationship upon a finding that any of the following circumstances exist:
> . . .
> (b) the child has been abandoned by the parents;
> . . .
> [or] (f) the child is an adjudicated youth in need of care and both of the following exist:
> (i) an appropriate treatment plan that has been approved by the court has not been complied with by the parents or has not been successful; and
> (ii) the conduct or condition of the parents rendering them unfit is unlikely to change within a reasonable time.

Section 41-3-609(1)(b) and (f), MCA.

¶26    We have previously upheld termination of parental rights where substantial evidence demonstrates a failure to meet the terms of the treatment plan. In *In re K.S*, although some friends testified against termination of parental rights, the bulk of evidence demonstrated a failure to meet the treatment plan. *In re K.S.,* 2003 MT 212, ¶¶ 18-20, 317 Mont. 88, ¶¶ 18-20, 75 P.3d 325, ¶¶ 18-20. Termination of parental rights was proper where there was a long course and documented history of abuse and neglect and a likelihood the same conduct would be repeated. *In re G.S.,* 2002 MT 245, 312 Mont. 108, 59 P.3d 1063. We upheld the termination of parental rights when the parent missed many mandatory meetings with the children and the children began acting out again when the parent did make it to the meetings. *In re Custody and Parental Rights of A.L.R.,* 2002 MT 183, ¶ 18, 311 Mont. 76, ¶ 18, 54 P.3d 17, ¶ 18. Also, the likelihood of the parent to repeat the same conduct is a factor to consider. *A.L.R.,* ¶ 19.

¶27 Mere compliance with the terms of a treatment plan does not always lead to successful completion. *In re S.M.,* 2001 MT 11, ¶ 44, 304 Mont. 102, ¶ 44, 19 P.3d 213, ¶ 44; *Matter of S.M.,* 1999 MT 36, ¶ 24, 293 Mont. 294, ¶ 24, 975 P.2d 334, ¶ 24. "[I]t is well established that a treatment plan can be unsuccessful even when the tasks were completed." *Matter of S.M.,* ¶ 25. "Partial compliance with a treatment plan is insufficient to preclude termination of parental rights." *In re B.C.* (1997), 283 Mont. 423, 430, 942 P.2d 106, 111. In *In re S.M.*, the mother had allowed her two children to be abused by two different men. Her treatment plans were not successful because she remained unable to understand or to anticipate the dangers her decisions posed to her children. *In re S.M.,* 2001 MT 11, ¶ 45. In *In re D.H.,* the parents partially completed their treatment plans and attended the mandatory counseling sessions, however, the plans were not "successful" in their completion because the parents had not improved their parenting skills nor were they able to protect their children. *In re D.H.,* 2001 MT 200, ¶¶ 29-30, 306 Mont. 278, ¶¶ 29-30, 33 P.3d 616, ¶¶ 29-30. *In re Declaring E.W.,* the mother complied with the terms of the treatment plan but the testimony was conflicting as to whether or not the plan had been successful. *In re Declaring E.W.,* 1998 MT 135, ¶¶ 19-25, 289 Mont. 190, ¶¶ 19-25, 959 P.2d 951, ¶¶ 19-25. The children's pediatrician testified that they were "high needs" children and the mother did not have the ability to respond to their needs. *In re Declaring E.W.,* ¶ 21. We concluded that the lower court's decision to terminate that mother's parental rights was supported by substantial evidence and was not clearly erroneous. *In re Declaring E.W.,* ¶ 25.

¶28 Here, Mother contends that she was complying with all of the terms of her latest court approved treatment plan. The last two treatment plans had four goals for Mother: (1) address her mental health issues; (2) establish a stable, consistent and safe environment; (3) address her children's mental health needs; and (4) establish a healthy relationship with her children and effectively parent. The record indicates that over a long period of years, Mother was the recipient of services under various and sundry social programs. She would show improvement for a time but inevitably relapse into her previous ways of doing things as she became overwhelmed. To successfully complete the treatment plan, it was vital that Mother demonstrate she would no longer become overwhelmed with the stresses of her life. This Mother did not do. Although she was addressing her underlying chemical dependency issues, she was not in compliance with her treatment plan because she denied the Department access to her mental health care providers. Just as in *A.L.R.*, Mother missed meetings and was likely to return to the lifestyle which gave rise to the proceedings. Most importantly, Mother did not demonstrate sufficient mental stability to be able to parent her high needs children.

¶29 The record clearly indicates that although Mother attempted to comply with the treatment plan, she was not successful in doing so; it is also clear the conduct and conditions which made Mother unfit were unlikely to change within a reasonable time. The findings of fact of the District Court are not clearly erroneous.

¶30 Because of the foregoing, the judgment of the District Court is affirmed.

/S/ W. WILLIAM LEAPHART

We concur:


/S/ KARLA M. GRAY
/S/ PATRICIA COTTER
/S/ JAMES C. NELSON
/S/ JOHN WARNER