FILED

May 28 2013

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

DA 12-0670

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2013 MT 141N

IN THE MATTER OF:

Q.R.K.,

A Youth in Need of Care.

APPEAL FROM:     District Court of the Fourth Judicial District,

In and For the County of Missoula, Cause No. DN 09-53

Honorable John W. Larson, Presiding Judge

COUNSEL OF RECORD:

For Appellant:

Johnna K. Baffa; Van de Wetering Law Offices, P.C.; Missoula, Montana

For Appellee:

Timothy C. Fox, Montana Attorney General; Katie F. Schulz; Assistant Attorney General; Helena, Montana

Fred R. Van Valkenburg, Missoula County Attorney; Diane Connor,

Deputy Missoula County Attorney; Missoula, Montana

_____

Submitted on Briefs:  April 24, 2013

Decided:   May 28, 2013

Filed:

_____

Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1 Pursuant to Section I, Paragraph 3(d), Montana Supreme Court Internal Operating Rules, this case is decided by memorandum opinion and shall not be cited and does not serve as precedent. Its case title, cause number, and disposition shall be included in this Court's quarterly list of noncitable cases published in the Pacific Reporter and Montana Reports.

¶2 L.R., the biological mother of Q.R.K., appeals an order of the Montana Fourth Judicial District Court, Missoula County, terminating her parental rights to Q.R.K. and granting permanent legal custody to the Montana Department of Public Health and Human Services (DPHHS or the Department). We affirm.

¶3 In September 2009, Missoula County police officers were asked to check on the welfare of a woman, L.R., who was intoxicated and unconscious at a local restaurant with her three-year-old daughter, Q.R.K. The police arrested L.R. and a social worker referred Q.R.K.'s case to DPHHS. On the ground that L.R. had abused or neglected Q.R.K., the Department filed a petition for emergency protective services. In April 2010, by stipulation of the parties, the court adjudicated Q.R.K. as a youth in need of care and awarded temporary legal custody of the child to DPHHS, which placed Q.R.K. with a foster family.

¶4 On July 27, 2010, following a hearing, the District Court approved in open court a phase-one treatment plan for L.R., which it then formally adopted on September 14, 2010. The treatment plan stated that L.R.'s history of chemical dependency and mental health issues, which were consistent with schizophrenia, had impaired her ability to effectively care for and parent Q.R.K.—a special needs child diagnosed with reactive attachment disorder (RAD). The plan provided detailed tasks and goals, as well as measures of success including, among other factors, L.R.'s demonstration of "regular and improved

2

parenting" and "put[ting] Q.K. first."  On motion of the Department, the District Court subsequently extended the order for temporary legal custody until April 2011 to allow L.R. more time to work toward completion of the treatment plan.  The court also approved the permanency plan of reunification if L.R. successfully completed her treatment plan within a reasonable time and reunification was found to be in the child's best interest.

¶5      In April 2011, the Department filed a petition to terminate L.R.'s parental rights to Q.R.K.  The District Court denied that petition, citing L.R.'s progress, as well as her persistence in attending counseling sessions, parent-coaching sessions and court hearings.  Instead, the court approved a phase-two treatment plan, which stated in part that "[f]or reunification to occur, [L.R.] will need to demonstrate consistently that she can positively and safely parent [Q.R.K.] without any coaching or support."

¶6      DPHHS filed a second petition to terminate L.R.'s parental rights in July 2012.  The Department alleged that L.R. had failed to comply with the phase-two treatment plan and that the plan had not been successful.  The District Court held a termination hearing on the matter over a period of three days in September 2012.

¶7      During the hearing, the District Court heard testimony from fourteen different witnesses, including mental health counselors, social workers, and four psychologists who had evaluated both L.R. and Q.R.K.  Although the psychologists generally commended L.R. for her dedication to and love for Q.R.K., they also testified that L.R. lacked basic parenting skills and that she could not adequately care for a high needs child with reactive attachment disorder.  One psychologist stated that children with RAD require high levels of structure, consistency and clear feedback.  L.R. was unable to provide such support due to her mental illness, but another psychologist testified that Q.R.K.'s foster parents had

been able to do so. A third psychologist worried that Q.R.K. was "aging out" of the window in which attachment therapy, a means to address RAD, still would be effective.

¶8 The court also heard testimony from counselors who had provided hundreds of hours of parenting lessons to L.R. These counselors testified that L.R. could not provide the parental care that Q.R.K. needed, that any progress L.R. had made in her parenting skills was inconsistent at best, and that this was unlikely to change within a reasonable time.

¶9 After the termination hearing, the District Court entered findings of fact and conclusions of law. The court found that Q.R.K. could not successfully be parented by someone with "marginal or erratic skills" and that "even after nearly three years of parenting coaching, none of the professionals working with [Q.R.K.] have recommended even starting unsupervised visitation with her mother" because L.R. lacked the skills to parent Q.R.K. adequately. For those reasons, the court found that "L.R. has failed to fully comply with the . . . Phase Two Treatment Plan or, more likely, she is unable to comply" and that, in any event, the treatment plan had been unsuccessful. The court further found that L.R. would not be able to acquire the skills necessary to adequately parent Q.R.K. within a reasonable time.

¶10 Although the District Court acknowledged that L.R. loved Q.R.K., it determined that it had to give "primary consideration to [Q.R.K's] needs" and that Q.R.K. could no longer wait for L.R. to improve her parenting skills. Finding that it was in Q.R.K's best interests for the court to terminate L.R.'s parental rights and award custody to the Department so that Q.R.K. could be adopted by her foster family, the District Court ordered that L.R.'s parental rights be terminated pursuant to § 41-3-609(1)(f), MCA.

¶11 L.R. appeals. She contends that the District Court erred in finding that she had failed to comply with her treatment plan because she successfully had addressed her chemical dependency problems and because she had made progress in developing her parenting skills and addressing her mental health

4

issues. L.R. also asserted that the court erred by finding it was in Q.R.K.'s best interests to terminate her parental rights.

¶12 We review a district court's order terminating parental rights for an abuse of discretion. *In re J.M.*, 2009 MT 332, ¶ 12, 353 Mont. 64, 218 P.3d 1213. A district court abuses its discretion when it "acts arbitrarily without conscientious judgment or exceeds the bounds of reason." *In re J.C.*, 2008 MT 127, ¶ 33, 343 Mont. 30, 183 P.3d 22. We review the trial court's findings of fact for clear error and its conclusions of law for correctness. *In re D.B.*, 2008 MT 272, ¶ 13, 345 Mont. 225, 190 P.3d 1072.

¶13 A court may terminate parental rights if "an appropriate treatment plan that has been approved by the court has not been complied with by the parents or has not been successful" and "the conduct or condition of the parents rendering them unfit is unlikely to change within a reasonable time." Section 41-3-609(1)(f), MCA. Although a natural parent's right to "care and custody of a child is a fundamental liberty interest," parental rights may be terminated when a parent only partially complies with a treatment plan and fails to improve her parenting skills as required by her treatment plan. *In re D.H.*, 2001 MT 200, ¶¶ 14, 29-30, 306 Mont. 278, 33 P.3d 616; *see also In re C.H.*, 2003 MT 308, ¶¶ 27-28, 318 Mont. 208, 79 P.3d 822.

¶14 Although L.R. may have complied with her treatment plan's terms regarding chemical dependency, L.R. never was able to demonstrate consistently that she could "positively and safely parent [Q.R.K.] without any coaching or support," as required by her treatment plan. The court correctly concluded that Q.R.K. did not have to wait for her mother to improve her parenting, as Q.R.K.'s need for stability is "paramount." *In re Custody & Parental Rights of D.A.*, 2008 MT 247, ¶ 26, 344 Mont. 513, 189 P.3d 631.

¶15     The District Court also found that the conditions rendering L.R. unfit were unlikely to change within a reasonable time, based primarily on L.R.'s inability to demonstrate that she adequately could care for Q.R.K.'s special needs, despite three years of coaching on her parenting skills. The record supports this finding.

¶16     We have determined to decide this case pursuant to Section I, Paragraph 3(d) of our Internal Operating Rules, which provides for noncitable memorandum opinions. The District Court made adequate findings of fact that find ample support in the record and its legal analysis correctly applied settled Montana law. Based on this record, we hold that L.R. has failed to establish that the District Court abused its discretion in terminating her parental rights.

¶17     Affirmed.


/S/ BETH BAKER


We concur:


/S/ MIKE McGRATH

/S/ MICHAEL E WHEAT

/S/ LAURIE McKINNON

/S/ BRIAN MORRIS


6