DA 25-0121

IN THE SUPREME COURT OF THE STATE OF MONTANA

2025 MT 299

IN THE MATTER OF:

I.D., T.D., and L.D.,

      Youths in Need of Care.

APPEAL FROM:  District Court of the Eighth Judicial District,
In and For the County of Cascade, Cause Nos. CDN-21-123,
CDN-21-124, and CDN-21-125
Honorable John A. Kutzman, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

      Laura Reed, Attorney at Law, Missoula, Montana

      For Appellee:

      Austin Knudsen, Montana Attorney General, Christine Hutchison,
Assistant Attorney General, Helena, Montana

      Joshua A. Racki, Cascade County Attorney, Valerie Winfield, Deputy
County Attorney, Great Falls, Montana

Submitted on Briefs:  November 13, 2025

Decided:  December 29, 2025

Filed:

_____
Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1     J.F. (Mother) appeals the Eighth Judicial District Court's Order granting the Department of Public Health and Human Services' petition for guardianship of her three children—I.D., T.D., and L.D.. Mother argues on appeal that (1) the District Court erred in finding that the Department made reasonable efforts to reunite the family and that further efforts to reunite the family would likely be unproductive; and (2) the District Court applied the incorrect burden of proof and failed to determine that she was an unfit parent before ordering guardianship. We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

¶2     In June 2021, Mother and Z.D. (Father) brought their one-month-old son T.D. to the emergency room after they observed that T.D. was not moving his left arm and appeared to be in pain. An X-ray revealed that T.D. had suffered a distal humeral fracture, which generally occurs when the arm is pushed, pulled, or turned with significant force. Hospital staff noted that the parents could not explain how T.D.'s injury occurred and appeared "calm to the point of aloofness." T.D. also had two unexplained tibial fractures. After T.D.'s hospital visit, Child and Family Services received a confidential intake report with concerns that T.D. and his siblings were abused, neglected, or in danger of being abused or neglected. The Child Protection Specialist (CPS) investigating this report discovered that the family had been involved with the Department since 2017 based on prior reports that the parents had neglected both L.D. and I.D..

2

¶3     The Department removed the children from the home and filed a petition for emergency protective services, adjudication as youths in need of care, and temporary legal custody in the Cascade County District Court on June 8, 2021. The court granted the Department's petition for emergency protective services and ordered a show cause and adjudication hearing. At the hearing, Mother stipulated that clear and convincing evidence supported the Department filing the petition, and the court adjudicated the children as youths in need of care. The Department placed the children with their maternal aunt.

¶4     The Department prepared treatment plans for Mother and Father. Mother's treatment plan required her to complete anger management, complete parenting and family-based services, provide proof of insurance or apply for Medicaid, and maintain weekly contact with CPS Tammy Borger. Mother stipulated to, and the court approved, Mother's treatment plan. The court granted the Department temporary legal custody of the children for six months. At the December 2021 status hearing, Mother and Father revealed that they had separated.

¶5     The court granted the Department's motions for six-month extensions of temporary legal custody in March 2022, August 2022, and February 2023. In December 2022, the court appointed Charla Merja as the children's guardian ad litem (GAL). Although Mother was making progress toward completing her treatment plan and was engaging with services, the Department expressed concerns about Mother's parenting skills and ability to provide safe and stable housing for the children. The Department remarked that Mother allowed unknown visitors to come to the home and occasionally spend the night. The

Department also described incidents where I.D. had an allergic reaction to a peanut-filled candy bar that L.D. was eating, and where Mother took the children swimming without life jackets. Mother subsequently began a relationship with S.G. and reported at the November 2022 status hearing that she was pregnant.

¶6 In June 2023, the children returned to Mother's care. At this point, Mother had given birth to her fourth child—A.G.. Mother, S.G., and her four children moved in with Mother's former foster parent, S.H., on a trial basis. CPS Borger reported that Mother struggled to manage all four children at once and that S.H. was stepping in to provide for the children's needs. L.D. struggled with behavioral issues and aggressive tendencies, and I.D. had a tendency to mimic L.D.'s behaviors. Both CPS Borger and GAL Merja remarked that the children's behavioral issues worsened after moving into S.H.'s house with Mother and S.G.. The Department filed another motion to extend its temporary legal custody in July 2023; Mother stipulated to a 90-day extension.

¶7 The Department removed I.D., T.D., and L.D. from Mother's care in August 2023 and placed them with S.H. after Mother and S.H.'s relationship deteriorated. Mother, S.G., and A.G. moved in with S.G.'s parents. Around this time, CPS Borger and other service providers reported that they were concerned about Mother's engagement. Mother missed scheduled visits as well as appointments for herself and her children on multiple occasions. In October 2023, L.D.'s behaviors significantly worsened. CPS Borger noted in an affidavit that L.D. was destroying her classrooms, leaving school, and causing the building to go into lockdown. L.D.'s school devised a plan for her to attend school for two hours

per day, progressing one hour at a time towards a full day once she showed that she could control her behaviors. L.D. was later diagnosed with ADHD and oppositional defiant disorder. The parties stipulated in November 2023 to extend the Department's temporary legal custody by 60 days.

¶8 The Department requested another extension in December based on Mother's continued inconsistent engagement. At the extension hearing, CPS Borger testified that Mother had not engaged with her mental health therapist, Tammy Kolstad, since October. Kolstad reported that this was partly because Mother had lost her Medicaid coverage. CPS Borger also reported that Mother had ceased taking medications to manage her bipolar disorder, missed multiple parent child interaction therapy (PCIT) appointments with L.D., and missed scheduled visits with the children. Mother objected and testified that her inability to attend services was in part because she did not have a vehicle. The Department explained that it provided Mother a bus pass and offered to assist with transportation. The Department argued that Mother's treatment plan was incomplete and that the big picture— Mother's inability to manage her own life, her children's lives, and to show interest in parenting—necessitated another extension of temporary legal custody. The court declined to rule on the Department's motion, ordered the Department to file conditions of return, and continued the hearing until January 16, 2024.

¶9 At the January 16 hearing, the Department presented witness testimony from Kolstad; Diane Evans, the children's primary care provider; Pattie Freer, I.D.'s therapist and the PCIT provider for L.D.; and Stephanie Engleman, another therapist who provided

5

services for Mother and L.D. for L.D.'s behavioral issues. All providers testified that Mother had not completed services and did not consistently attend appointments. The Department contended that based on this evidence, Mother had not completed her treatment plan. Mother argued that the Department was unnecessarily dragging the case out. The court agreed with the Department, concluding that Mother had yet to accomplish the component of her treatment plan that required her to successfully complete parenting and family-based services. Based on this finding, the court granted the Department another six-month extension of temporary legal custody.

¶10 In February 2024, however, the Department filed a notice of permanency plan report changing its permanency plan from reunification with Mother to guardianship with S.H.. CPS Borger's affidavit in support of the permanency plan specified that Mother was not engaging with the Department or her treatment plan and that the children were bonded to S.H.. The court approved the Department's plan.

¶11 Following a visit with Mother on March 26, 2024, I.D. experienced pain in her vaginal area and symptoms resembling a urinary tract infection. S.H. took I.D. to a walk-in clinic where testing confirmed that I.D. did not have a UTI. The next day, I.D. returned to the clinic and told her nurse that at her most recent visit, S.G. had wiped her without toilet paper and inserted his finger in her "peepee." Medical professionals reported abnormal findings after completing a sexual assault exam, and I.D. repeated her disclosure to law enforcement during a forensic interview. Mother and S.G. denied I.D.'s allegations. Tammy Watson, a visit supervisor with RE Family Services, was present at the visit in

question. She reported that the alleged abuse could not have taken place during that visit because I.D. was in the bathroom by herself, and the bathroom door remained open the entire time. Watson testified that she observed S.G. stand by the kitchen door the entire time I.D. was using the bathroom. The Department paused visitation and all contact with Mother and S.G.. Visitation resumed in May, but the Department decreased visitation time, ceased in-home visits, and changed visit supervisors. I.D. stopped attending visits.

¶12 The Department filed its petition for guardianship in June 2024, alleging that it was in the children's best interests to remain with S.H., that the Department had made reasonable efforts to reunify the family, and that further efforts would be unproductive. The Department emphasized that the children had been in its custody for most of their lives and that they needed permanency and stability. Mother objected to the proposed guardianship. The District Court originally scheduled the contested guardianship hearing for October 1, 2024, but it later continued the hearing until January 10, 2025.[1] The court extended the Department's temporary legal custody.

¶13 At the guardianship hearing, service providers for both Mother and the children testified, as did a friend of Mother, CPS Borger, GAL Merja, and S.G.. Kolstad and Freer testified that Mother had completed mental health counseling, PCIT, and attachment therapy with T.D.. Although the Department conceded that Mother had completed her treatment plan, it argued that her treatment plan was not successful. The Department

---

[1] The court continued the hearing because of Father's disclosure of new allegations that the Indian Child Welfare Act (ICWA) may govern the proceedings. By January 10, 2025, the Department confirmed that the children were not eligible for enrollment with any tribe and therefore ICWA did not apply.

argued that despite years of services, Mother still had not demonstrated that she could safely parent her children—especially when she had all four children together. CPS Borger testified that all three children had expressed that they did not want to return to Mother's care. Mother responded that the Department failed to make reasonable efforts towards reunification because it refused to initiate attachment therapy to repair her bond with I.D..

¶14 The District Court orally granted the Department's petition at the hearing and later issued its order and decree of guardianship.[2] The court acknowledged that the Department failed to order attachment therapy with I.D. but remarked that the therapy was unlikely to succeed. The court found that, on the whole record, the Department made reasonable efforts to reunite the children, that further efforts would likely be unproductive, and that it was in the children's best interests to remain with S.H.. The court did not find that it was in the children's best interest to terminate Mother's parental rights.

## STANDARD OF REVIEW

¶15 This Court reviews a district court's conclusions of law for correctness. *In re S.S.*, 2022 MT 75, ¶ 12, 408 Mont. 238, 507 P.3d 1161. We do not disturb a district court's findings of fact unless they are clearly erroneous. *In re Custody of & the Parental Rights of T.Z. & J.Z.*, 2000 MT 205, ¶ 10, 300 Mont. 522, 6 P.3d 960. We will reverse for clear error only in the following circumstances: (1) the court's finding was not supported by substantial evidence, (2) the court misapprehended the effect of the evidence, or (3) we are

---

[2] The court found the situation to be different with the youngest child, A.G., and denied the Department's guardianship petition with respect to him, keeping the parent's treatment plans in place. A.G. is not at issue in this appeal.

left with a definite and firm conviction that the court made a mistake. *In re S.S.*, ¶ 12. We view the evidence in the light most favorable to the prevailing party when determining whether substantial evidence supports the district court's findings. *In re S.S.*, ¶ 12. "Substantial evidence is evidence that a reasonable mind might accept as adequate to support a conclusion, even if weak and conflicting." *In re S.S.*, ¶ 12 (citing *In re J.H.*, 2016 MT 35, ¶ 24, 382 Mont. 214, 367 P.3d 339).

## DISCUSSION

¶16 *1. Did the District Court clearly err in finding that the Department made reasonable efforts to reunite the family and that further efforts would likely be unproductive?*

¶17 The Department or a GAL may petition the court to appoint a guardian for a child who is in the temporary or permanent legal custody of the Department. Section 41-3-444(1), MCA. Before granting a petition for guardianship, the court must find, among other facts, that "the department has made reasonable efforts to reunite the parent and child, further efforts to reunite the parent and child by the department would likely be unproductive, and reunification of the parent and child would be contrary to the best interests of the child." Section 41-3-444(2)(d), MCA.

¶18 On appeal, Mother contends that the District Court clearly erred in finding that the Department made reasonable efforts to reunite her with her children and that further efforts to reunite them would likely be unproductive. Mother does not contest that the Department proved the remaining statutory criteria under § 41-3-444(2), MCA.

9

**Reasonable Efforts to Reunify**

¶19    Mother first argues that the Department unreasonably ceased efforts to repair her bond with I.D. after the child alleged that S.G. had sexually abused her.  Mother contends that the Department faulted her for I.D.'s "non-credible" allegations by reducing visitation time, changing visit supervisors, and refusing to order attachment therapy with I.D..  The State responds that Mother has not provided evidence that additional services would have repaired her bond with I.D. and that overall, the Department made reasonable efforts to reunify the family throughout the pendency of this three-and-a-half-year case.

¶20    The Department is required to make reasonable efforts to reunite families while still prioritizing the child's health and safety.  Section 41-3-423(1), MCA.  We have interpreted this standard to require the Department to, in good faith, develop and implement treatment plans and voluntary services for parents and assist parents with completing them.  *In re R.J.F.*, 2019 MT 113, ¶ 28, 395 Mont. 454, 443 P.3d 387 (citations omitted) (interpreting § 41-3-423(1), MCA (2007)); *see also* § 41-3-423(1)(b), MCA.  The Department need not engage in "herculean efforts" to reunify families.  *In re R.J.F.,* ¶ 38.  A parent must "avail herself of services arranged or referred by the Department and engage with the Department to successfully complete her treatment plan."  *In re R.J.F.*, ¶ 38 (citations omitted).  Courts analyze the unique facts of each case in determining whether the Department has satisfied the "reasonable efforts" standard.  *In re J.H.*, ¶ 17.

¶21    We first address Mother's argument that the Department unreasonably reduced her visitation time and changed supervisors after I.D.'s sexual abuse disclosure.  Watson

10

stopped working with the family because she was listed as a witness to the alleged abuse. Kim Sayre, a social services technician and visit coach for the Department, took over for Watson in May 2024. The Department paused visitation for roughly one month. At the April 9, 2024 status hearing, the Department explained that this decision was based on I.D.'s physical symptoms as well as medical providers' recommendations. When visits resumed, the Department reduced visitation time from three, two-hour visits per week to one, ninety-minute visit per week. I.D. was absent from all but two visits from March 26, 2024, until the guardianship hearing. GAL Merja reported that I.D. did not want to see Mother, and Merja did not press the issue to avoid retraumatizing her.

¶22 The District Court did not find the Department's response to I.D.'s allegations to be unreasonable. Because Watson was a potential witness to the alleged abuse, the Department stopped using Watson's services and employed a neutral supervisor. Although Watson reported that she did not believe that S.G. abused I.D., medical professionals advised that I.D. presented concerning physical symptoms and recommended that the Department pause visits with Mother. S.G. continued to live with Mother after I.D.'s disclosure, and law enforcement was still investigating I.D.'s claims at the time of the guardianship hearing. Because the Department must balance its efforts to reunify families with the children's health and safety, the District Court did not clearly err in failing to find that these decisions were unreasonable. Section 41-3-423(1)(c), MCA.

¶23 Mother maintains, however, that the Department unreasonably refused to order attachment therapy between I.D. and Mother. Kolstad testified that she recommended

11

Mother and I.D. participate in attachment therapy to repair their bond. Because the October 2024 guardianship hearing was approaching, Kolstad and CPS Borger agreed to wait until the court issued its decision. Although the court continued the hearing until January 2025, the Department did not contact providers to initiate attachment therapy. Kolstad testified that there likely would have been enough time between October and January to complete the program. Kolstad also testified, however, that she contacted the Department after the October hearing and recommended that I.D.'s existing therapist administer the attachment therapy. Freer, I.D.'s individual therapist, explained that "at this time" she was not willing to begin attachment therapy because she wanted to hold off until the court decided guardianship. Freer answered "yes" when counsel asked whether, "as a provider who works with children and their health and well-being," timing was an important consideration in her decision. Freer testified that the Department did not contact her again after this initial conversation, and that she could not estimate how long it would take to complete the program. At the hearing, the District Judge remarked, "I am troubled by the . . . non-pursuit of attachment therapy . . . . What I keep thinking is, we're four years into this now and we tried a lot of things and the kids don't want to go home."

¶24 Although the District Court expressed concern about the Department's non-pursuit of attachment therapy, it did not err in recognizing the Department's discretion to make this decision if it determined that forcing I.D. to participate would undermine her health or safety. *See* § 41-3-423(1)(c), MCA. Freer testified that she was not willing to provide attachment therapy at that time, and this decision was made in consideration of I.D.'s

well-being. The court weighed Freer's testimony and did not find her recommendation unreasonable. On balance, the court gave highest priority to the children's best interests and emphasized the importance of keeping the three siblings together. It found no reason to believe that attachment therapy would have overcome "[I.D.]'s unwillingness to be in the same household as [S.G.] or her apparent resentment of [Mother] for continuing to be in a relationship with him." The court concluded "[s]o [I.D.] is intractably opposed to reunification, [L.D.] has tremendous behavioral problems which [Mother] seems not to understand or be able to control, and [T.D.] is too young to have positive or negative attachment issues but wants to remain with [S.H.] as do the other two . . . children. They are full siblings. The evidence in this case does not warrant separating them from each other."

¶25 Whether the Department made "reasonable efforts" to reunify the family "is not static or determined in a vacuum, but rather is dependent on the factual circumstances of each case[.]" *In re R.L.*, 2019 MT 267, ¶ 22, 397 Mont. 507, 452 P.3d 890 (explaining that this Court did not fault the Department when the parent resisted engagement, moved away, and never contacted her CPS worker again). In the present case, the Department developed a treatment plan for Mother and provided the following services: visitation with the children, anger management, PCIT with L.D., attachment therapy with T.D., mental health therapy, and medication management services. When Mother's engagement with services was inconsistent, the Department helped Mother obtain transportation to visits and appointments and assisted her with scheduling. This case was open for over three years,

and the Department filed many extensions of temporary legal custody before petitioning for guardianship. The record as a whole does not show clear error in the District Court's finding that the Department acted in good faith to provide services to the family and assist Mother in her effort to complete them.

¶26 We also consider the child's need for permanency and stability when determining whether the Department made "reasonable efforts." *See In re K.L.*, 2014 MT 28, ¶ 41, 373 Mont. 421, 318 P.3d 691. I.D., T.D., and L.D. had been in the Department's custody for the majority of their lives. CPS Borger testified that the children needed permanency, that they wanted to remain with S.H., and that Mother was unable to provide for their needs. Viewing the evidence in the light most favorable to the Department, we conclude that substantial evidence supported the District Court's finding that the Department made reasonable efforts to reunify Mother and her children.

**Further Efforts to Reunify**

¶27 Before granting a petition for guardianship, the court also must find that further efforts to reunify the family would likely be unproductive. Section 41-3-444(2)(d), MCA. The District Court concluded that the Department satisfied this element because the children preferred to remain with S.H., there was no evidence that attachment therapy would overcome I.D.'s resentment towards Mother, and Mother proved unable to manage the children's behavior issues or to parent all four children successfully.

¶28 Mother first argues that the court clearly erred by failing to credit her for completing her treatment plan when it concluded that further efforts would be unproductive. The

14

Department responds that the court was not required to find that Mother's treatment plan was unsuccessful before granting its petition for guardianship. The Department is correct that this is a required finding in a termination of parental rights case and not in a guardianship case. *Compare* § 41-3-609(1)(f)(i), MCA, *with* § 41-3-444(2), MCA. Whether the parents have complied with their treatment plan, however, is relevant to the court's determination that further efforts to reunify the family would likely be unproductive. *See In re S.S.*, ¶ 16. For example, in *In re S.S.*, we considered evidence that mother had not completed her treatment plan after more than 15 months to determine that substantial evidence supported the trial court's finding that further efforts towards reunification would likely be unproductive. *In re S.S.*, ¶ 16.

¶29 Although the Department conceded that Mother completed her treatment plan, this fact is not dispositive to the court's guardianship determination. At the hearing, the Department argued that Mother's treatment plan had not successfully resolved the Department's concerns. Both CPS Borger and GAL Merja testified that Mother struggled to multitask and keep her children safe. They stated that Mother's skills had not improved despite the services that she had been offered over the past three-and-a-half years. Visit supervisor Sayre reiterated these concerns, citing a recent incident where she had to remove rocks from A.G.'s mouth during a visit because Mother was solely focusing on L.D. and ignoring her other children. CPS Borger also noted L.D.'s "extraordinary" behavior issues as a safety concern and testified that she believed L.D.'s behaviors would worsen in Mother's care. She explained that it was "more likely than not" that one of the children

15

would be hurt if returned to Mother. Watson disagreed and testified that based on her observations before she stopped supervising visits, she believed that Mother could safely manage all four children at once.

¶30 CPS Borger also testified that she did not believe that Mother had a productive understanding of the children's needs. The record reflects that Mother's engagement with services was inconsistent at times, causing her to miss her own and the children's appointments. In an affidavit filed in December 2023, CPS Borger reported that S.H. and other service providers were stepping in to facilitate transportation to appointments and visits and that Mother was relying on CPS Borger to facilitate visitation schedules for the family. In its order granting guardianship, the District Court considered this evidence and found that although Mother finished her treatment plan, "the record shows the conditions that make the children unsafe in her care continue."

¶31 Evidence may be substantial even though it is weak and conflicting. *In re J.H.*, ¶ 24. Although the record establishes that Mother completed her treatment plan, the court heard conflicting evidence regarding whether Mother could successfully implement the skills she learned to safely parent all of her children at once and to prioritize the children's unique needs. When determining whether substantial evidence supports the district court's findings, we do not reweigh the evidence or consider whether the evidence could have supported a different result. *In re S.S.,* ¶ 16 (citation omitted). A reasonable mind might accept CPS Borger's, GAL Merja's, and Sayre's testimony as adequate to support the

conclusion that Mother had not gained the skills to safely parent all her children at once despite completing the tasks in her treatment plan.

¶32 Mother next argues that the court clearly erred by justifying its conclusion that attachment therapy between Mother and I.D. was unlikely to be successful with I.D.'s "unsupported, unproven" sexual abuse claims. In its findings, the District Court credited Watson's testimony that the alleged molestation did not occur. The court found, however, that "[I.D.] sincerely believes that the molestation event actually happened[,]" that she appears to resent Mother for not ending her relationship with S.G., and that she is not open to attachment therapy with Mother. The court concluded that "the prospects of such therapy succeeding have been and remain low."

¶33 Conflicting evidence exists regarding whether S.G. molested I.D. during the visit in question. After the alleged abuse occurred, however, I.D. identified S.G. as her abuser to medical professionals, law enforcement, and her therapist, and she refused to attend visits or engage with Mother. Freer advised against beginning attachment therapy with I.D. because she believed it would be counterproductive and potentially traumatizing. GAL Merja testified that at I.D.'s last visit with Mother right before the hearing, I.D. was withdrawn and did not want to interact with Mother. After the visit, I.D. was clingy and began wetting her bed. A reasonable mind might accept this evidence as adequate to support the District Court's conclusions that I.D.'s insistence that the sexual abuse occurred and her resentment of Mother rendered low the prospects of attachment therapy succeeding. In the meantime, the children needed permanency, and the court found from

17

the evidence that Mother was not able to safely parent her children after more than three years of the Department's involvement.

¶34 The District Court's findings are supported by this record. The Department presented evidence that Mother lacked the ability to safely parent her children despite receiving services for over three years. The Department did not order attachment therapy with I.D., but this therapy, even if successful, would not have resolved its concerns about Mother's parenting skills given her continued challenges with L.D.'s behavior issues and her inability to manage parenting of four children. Viewing the evidence in the light most favorable to the Department, we conclude that the record contains substantial evidence to support the District Court's finding that further efforts to reunify the family would likely be unproductive. We therefore conclude that the District Court did not clearly err in finding that the Department made reasonable efforts to reunite the family and that further efforts would be unproductive.

¶35 *2. Did the District Court correctly determine that the Department met its burden of proving that the court should order guardianship?*

¶36 Mother next argues that the Department failed to meet its burden of proving that the court should order guardianship. Mother contends that the Department was required to prove that Mother was an unfit parent and that it did not meet its burden of proving that guardianship should be ordered either by clear and convincing evidence or by even a preponderance of the evidence.

¶37 We first address Mother's argument that the Department was required to prove that Mother was an unfit parent prior to ordering guardianship. Mother analogizes the finding

18

required by § 41-3-444(2)(d), MCA, that further efforts towards reunification would likely be unproductive to the requirement in § 41-3-609(1)(f)(ii), MCA, that a parent's rights may not be terminated unless "the conduct or the condition of the parents *rendering them unfit* is unlikely to change within a reasonable time." (Emphasis added).

¶38 When interpreting a statute, this Court's role is to "ascertain and declare what is in terms or in substance contained [in the statute], not to insert what has been omitted or to omit what has been inserted." Section 1-2-101, MCA; *State v. Running Wolf*, 2020 MT 24, ¶ 15, 398 Mont. 403, 457 P.3d 218. The alleged requirement that the court must find Mother "unfit" before ordering guardianship does not appear in the text of § 41-3-444, MCA. The Legislature explicitly included this requirement in the termination of parental rights statute but not in the guardianship statute. We will not insert such a requirement when the Legislature expressly omitted it. We therefore conclude that the District Court was not required to find that Mother was an "unfit" parent prior to ordering guardianship.

¶39 We finally address Mother's argument that the Department did not meet its burden of proving that guardianship should be ordered. Mother asks us to apply a "clear and convincing evidence" standard in guardianship cases. Section 41-3-422(5), MCA, explicitly defines the burdens of proof for various child abuse and neglect petitions, including (1) "probable cause for the issuance of an order for immediate protection and emergency protective services or an order for temporary investigative authority," (2) a preponderance of the evidence for an order of adjudication or for temporary or long-term

19

custody, or (3) "clear and convincing evidence for an order terminating the parent-child legal relationship."

¶40 Neither § 41-3-422, MCA, nor § 41-3-444, MCA, specifies the Department's burden of proof in guardianship cases, and we are not inclined to insert Mother's suggested requirement. *See* § 1-2-101, MCA. Further, in *In re S.S.*, we explicitly rejected the parent's argument that the guardianship statute imposes a "clear and convincing evidence" burden on the Department. *In re S.S.*, ¶ 12 n. 1 ("Section 41-3-444, MCA, does not impose a 'clear and convincing evidence' burden. The statute states only that '[t]he court may appoint a guardian for a child pursuant to this section if the following facts are found by the court.'"). The Department was therefore not required to prove its case by clear and convincing evidence.

¶41 Mother lastly contends that the Department failed to satisfy its burden of proof even if we apply a preponderance of the evidence standard. Although we acknowledge that the record contains conflicting evidence, the District Court was in the best position to weigh the evidence and determine whether the Department met its burden of proof. *See In re T.M.M.*, 234 Mont. 283, 287, 762 P.2d 866, 869 (1988). The District Judge presided over this case for more than three years. He was actively engaged in the proceedings and showed conscientiousness toward Mother throughout. For example, at the August 30, 2022 extension hearing, the District Judge criticized the Department's "ambiguous" and "discretionary" concerns about Mother's decision-making but also stated that he needed to see "some sustained conduct by [Mother] that I could rely on as showing me she's reached

20

a point in her life where being the kid[s'] mom was going to be her first priority." In February 2023, the District Judge encouraged Mother to "keep on the straight and narrow," emphasizing that it was a "big deal" that the Department had not filed for guardianship yet and thought that she would eventually be able to parent her children. At the guardianship hearing, he expressed a measure of frustration about the Department's "continued discussion of concerns and questions" about Mother's parenting, emphasizing that it was the Department's burden to prove that guardianship was warranted. Ultimately though, upon conscientious scrutiny of the Department and careful weighing of the evidence, the court found that the Department met its burden of proof.

¶42    On appeal, our role is to determine whether substantial evidence supports the district court's findings. *In re S.S.*, ¶ 12. As discussed, we conclude that substantial evidence supported the court's findings that the Department made reasonable efforts to reunify the family and that further efforts would be unproductive. The record also supports the District Court's finding that guardianship would best serve the interests of the children. Mother has not met her burden on appeal to demonstrate reversible error.

## CONCLUSION

¶43    Viewing the evidence in the light most favorable to the Department, we conclude that substantial evidence supports the District Court's findings that the Department made reasonable efforts to reunify Mother with her children and that further efforts would likely be unproductive. The Department was not required to prove that Mother was an unfit

parent in order to obtain a guardianship for the children.  We therefore affirm the District Court's order granting the Department's petition for guardianship.

/S/ BETH BAKER

We Concur:

/S/ CORY J. SWANSON
/S/ JAMES JEREMIAH SHEA
/S/ INGRID GUSTAFSON
/S/ JIM RICE